UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
NATHAN DERSHOWITZ, Executor of the Estate of    12 Civ. 8634 (SN)
MARILYN DERSHOWITZ, deceased,

                Plaintiff,            PLAINTIFF'S PROPOSED
                                        FINDINGS OF FACT AND
      -against-                   CONCLUSIONS OF LAW

THE UNITED STATES OF AMERICA,

                Defendant.
------------------------------------------------------------------x

## PROPOSED FINDINGS OF FACT

### Marilyn Dershowitz and Nathan Dershowitz

1.      On July 2, 2011, at approximately 11:30 a.m., Marilyn Dershowitz and her

husband, Nathan Dershowitz, left their home at 2 Tudor City Place at approximately 41st Street

and 2nd Avenue in Manhattan to bicycle along the bike path on the Hudson River. [Anticipated

testimony of Nathan Dershowitz]

2.      It was a bright, clear and sunny day. [Stipulation]

3.      Marilyn Dershowitz was riding a Fuji Nevada mountain bike, appropriately

dressed in bike shorts, a white tee shirt and wearing a helmet. The bicycle she was riding was in

good condition and had no mechanical defects. [Anticipated testimony of Nathan Dershowitz]

4.      The approximate height of a handle bar on a 26 inch bicycle frame such as the one

being ridden by Marilyn Dershowitz is 41 inches to 42 inches. [Anticipated testimony of Robert

Genna, Plaintiff's Accident Reconstructionist]

5.      Marilyn Dershowitz was a very experienced bicyclist.  She worked in the New

York State Supreme Court in lower Manhattan and regularly commuted by bicycle between her home and the courthouse.  In addition, Marilyn Dershowitz and her husband frequently rode their bicycles together for recreation, one to two times per week in the spring, summer and fall. [Anticipated testimony of Nathan Dershowitz]

6.      After leaving their home, Marilyn and Nathan Dershowitz rode their bicycles south on 2nd Avenue and made a right turn to proceed west on West 29th Street to the bike path along the Hudson River.  [Anticipated testimony of Nathan Dershowitz]

7.      As they rode on West 29th Street, between 7th and 9th Avenues, the traffic was light.  It was a Saturday, the July 4th holiday weekend. [Anticipated testimony of Nathan Dershowitz]

8.      At approximately 12:00 p.m., Marilyn and Nathan Dershowitz approached the intersection of 9th Avenue and West 29th Street.  Nathan Dershowitz was slightly ahead of Marilyn Dershowitz and he continued through the intersection across 9th Avenue to 10th Avenue. Marilyn Dershowitz, however, stopped on West 29th Street on the east side of 9th Avenue for a red light. [Anticipated testimony of Nathan Dershowitz, Genna, Pl. Ex. 1]

<u>Ian Clement and the 7 Ton Truck</u>

9.      Ian Clement was an employee of the United States Postal Service ("USPS") and was driving his truck while in the course and scope of his employment. [Stipulation]

10.     He was the driver of the USPS truck that ran over and killed Marilyn Dershowitz. [Anticipated testimony of New York City Police Officer Scott Doerzbacher, NYPD Detective Victor Rivera; Pl. Ex. 2A]

11.     Clement had been driving trucks for the USPS for approximately 23 years.  In the

five years prior to the accident, Clement drove 7-Ton trucks, such as the one involved in this accident, 95% of the time.  Clement always drove the same truck and had driven the truck involved in this accident hundreds of times. [Anticipated testimony of Clement]

12.     Prior to the date of the accident, Clement would encounter people on bicycles in front of him on a daily basis when driving his 7-Ton truck through New York City.  When he would encounter a bicyclist, Clement would slow down and try to keep the bicyclist under his constant observation.  Clement admitted that if the bicyclist was in the same lane as his truck, he would not pass the bicyclist.  He also admitted that if he was passing a bicyclist, he would always move over an entire lane before passing to ensure a safe distance.  [Anticipated testimony of Clement]

13.     Clement was very familiar with West 29th Street between 9th and 10th Avenues. He had been driving down West 29th Street all of his career and would drive the street hundreds of times each year. [Anticipated testimony of Clement]

14.     On July 2, 2011, the date of the accident, Clement reported to work at approximately 9:00 a.m.  He went to the USPS Vehicle Maintenance Facility ("VMF")  at 11th Avenue and 25th Street where he got his 7-Ton truck. [Anticipated testimony of Clement]

15.     The 7-Ton truck Clement was operating at the time of the accident had two side mirrors on the left front corner and two side mirrors on the right front corner.  The top mirror on both sides was a flat mirror and the bottom mirror was a round mirror.  [Anticipated testimony of Clement, Genna; Pl. Ex. 12A, 14A, 15G]

16.     Prior to his shift on the date of the accident, Clement claims he did an inspection of his truck.  In that inspection he claims that he checked the lights on the truck, in particular the

3

lights on the upper right and upper left corners of the trailer portion referred to as the box. He says he checked the lights and that they were working. He further said that if a light was not working he would drive the truck into the garage to have it fixed and not leave the garage until it was fixed. Following the accident, on July 8, 2011, the USPS did an inspection of Clement's truck and found the left and right rear corner box lights to be inoperable. [Anticipated testimony of Clement and in contradiction to his testimony, Pl. Ex. 15]

17.    When Clement would use his side mirrors, he claims he would be looking for, among other things, pedestrians, bicyclists and vehicles to the side of his truck and behind the mirrors. When looking into the right mirror, Clement could see the front corner of the box portion of the 7-Ton truck, the roadway and all the way along the right side of the box. When Clement would look into the round mirror he could see further out away from the truck and the roadway. [Anticipated testimony of Clement]

18.    The 7-Ton truck being driven by Clement at the time of the accident was 24 feet 10 inches long (299 inches), 8 feet wide (96 inches), and 11 feet high (132 inches). The wheel base - the distance from the front axle to the rear axle - was 13 feet 6 inches. The height from the ground to the bottom of the trailer portion of the truck, or box, was 46 inches. The front overhang - the distance from the front of the postal truck to the front axle - varied in height from 24 inches to 56 inches due to the wheel well, the area around the tire. [Anticipated testimony of Genna; Pl. Ex. 12B, 12C, 12E]

<u>Twenty-Ninth Street between Ninth and Tenth Avenue</u>

19.    West 29th Street between 9th and 10th Avenues is a one-way, westbound, single lane straight and level roadway level.  [Stipulation, Anticipated testimony of Doerzbacher]

4

20.     There was no bicycle path on West 29th Street and no lane markings on the day of the accident. [Anticipated testimony of Nathan Dershowitz and Doerzbacher]

21.     On the north and south sides of West 29th Street between 9th and 10th Avenues is the Morgan Mail Facility which is operated and used by the United States Postal Service.  On the north side, or right side, of West 29th Street the building is known as Morgan North and on the south side, or left side, of West 29th Street the building is known as Morgan South. [Anticipated testimony of Clement, Postal Police Officer Rosemary Jones and Genna]

22.     United States Postal trucks pick up and deliver mail in Morgan South by making a left off of West 29th Street about five feet from 10th Avenue into the actual building of Morgan South.  The trucks then proceed eastbound inside the building and then exit Morgan South onto 29th Street closer to Ninth Avenue by making a left out of the building.  Because West 29th Street is a one way roadway, the trucks are forced to travel a second time westbound along West 29th Street to 10th Avenue to proceed to their destination.  With respect to Morgan North, United States Postal Trucks back into bays on the north side of West 29th Street to pick up and deliver mail. [Anticipated testimony of Clement, Genna]

23.     Approximately 175 feet west of 9th Avenue is an overpass that connects Morgan South and Morgan North.  On that overpass were two signs.  One sign on the left/south side of the overpass read:  "This Side of the Street U.S. Postal Trailer Parking Only."  The other sign on the right/north side of the overpass read:  "This Side of the Street No Parking Any Time Tow Away Zone." No exceptions to this sign permitted postal vehicles to block the travel portion of West 29th Street. [Pl. Ex. 13A; Anticipated testimony of Genna]

24.     At the time of the accident, a number of trailers operated and used by the USPS

were parked parallel to the curb on the left/south side of West 29th Street under the overpass and under the sign that read "This Side of the Street U.S. Postal Trailer Parking Only." [Anticipated testimony of Doerzbacher, Clement, Pl. Ex. 14E]

25.      On the right/north side of the street, a trailer operated and used by the USPS bearing number 7025044 was backed into a bay and parked perpendicular to the curb under the sign that read "This Side of the Street No Parking Any Time Tow Away Zone." [Pl. Ex. 14E, 14Q, 14R, 14T; Anticipated Testimony of Doerzbacher and Ronald Critelli, USPS employee]

26.      West 29th Street between 9th and 10th Avenue is approximately 34' wide.  The trailers on the south and north sides of West 29th Street reduced the width of the roadway.  The perpendicular trailer on the north side completely blocked the north side sidewalk, protruded across the sidewalk and extended into the travel portion of West 29th Street approximately 6 feet, 3 inches.  The trailer parked parallel to the curb on the south side, across from the north side perpendicular trailer, was approximately 6 feet, 8 inches wide and further reduced the width of the roadway.  [Pl. Ex. 3C, Anticipated testimony of Genna, Doerzbacher, and Nathan Dershowitz]

27.      The perpendicular trailer was not only parked and extending into West 29th Street, but it was also completely blocking the sidewalk of West 29th Street forcing Marilyn Dershowitz to move to her left to pass the perpendicular trailer. [Pl. Ex. 13A; Anticipated testimony of Dershowitz and Genna]

28.      The trailer on the north side of West 29th Street should not have blocked the sidewalk or protruded into the street, and it was wrong for it to be in the street. [Anticipated testimony of Critelli, Genna]

29.     The trailers on the south and north sides of West 29th Street created a dangerous and hazardous condition on the roadway by reducing the width of the travel portion of the roadway from 34 feet to approximately 21 feet. [Anticipated testimony of Critelli, Genna, and Doerzbacher]

<u>The Accident</u>

30.     At 9:30 a.m., Clement left the Vehicle Maintenance Facility in his 7-Ton truck and drove to the Peter Stuyvesant station at 13th Street and Avenue A to pick up mail.  He then drove back to Morgan to deliver the mail.  He arrived at Morgan at approximately 10:15 a.m., approximately 1 hour and 45 minutes before the accident. [Anticipated testimony of Clement]

31.     When he arrived at Morgan at approximately 10:15 a.m., he saw the perpendicular trailer protruding from the north side into West 29th Street and saw the trailers parked parallel to the curb on the south side.  He passed between the perpendicular trailer on the north and parallel trailers on the south and made a left into Morgan South to deliver the mail. [Anticipated testimony of Clement]

32.     Clement then exited Morgan South onto West 29th Street which required him to drive a second time between the parallel and perpendicular trailers on West 29th Street.  Once again he had notice that these postal vehicles reduced the width of the travel portion of the roadway and blocked the north sidewalk.  He then drove to 28th Street and 10th Avenue where he had breakfast in his truck.  Following breakfast, Clement drove to 8th Avenue, made a left onto West 29th Street, and parked in the middle of the block on West 29th Street between 8th and 9th Avenues for a break.  [Anticipated testimony of Clement, Genna]

33.     Clement was parked there on his break for approximately 1 hour and 25 minutes

7

during which time he took a 45 minute nap. [Anticipated testimony of Clement]

34.     After Clement had been parked for approximately 1 hour and 25 minutes and taken his 45 minute nap, he pulled out to go west on West 29th Street intending to drive again, for the third time, on West 29th Street to enter Morgan South. [Anticipated testimony of Clement]

35.     At approximately the time that Clement pulled out, Marilyn Dershowitz was stopped on her bicycle on the east side of 9th Avenue for the traffic light. [Pl. Ex. 1, Anticipated testimony of Genna]

36.     Clement did not stop for a red light at 9th Avenue.  Before crossing over 9th Avenue, Clement alleges he looked for bicycles to the right for 8 seconds and to the left for 5-6 seconds but claims he did not see any. [Anticipated testimony of Clement]

37.     Victor Rivera, a detective with the New York City Police Department Accident Investigation Squad, testified that Clement admitted that he saw a bicyclist ahead of him at some point prior to the happening of the accident. [Anticipated testimony of Detective Victor Rivera; Government Exhibit 7]

38.     Clement denies that he ever saw a bicyclist. [Anticipated testimony of Clement]

39.     When the light turned green for traffic on West 29th Street, Marilyn Dershowitz, wearing a helmet, rode her bicycle across 9th Avenue along the right side of the roadway, riding at a reasonably slow speed and as close to the right hand curb as practicable. [Pl. Ex. 1]

40.     When Marilyn Dershowitz crossed over 9th Avenue on West 29th Street, she was riding westbound well in front of the 7-Ton postal truck. [Pl. Ex. 1]

41.     When Marilyn Dershowitz crossed 9th Avenue, Clement was driving the 7-Ton postal truck behind her bicycle. [Pl. Ex. 1]

8

42.     As Clement drove across 9th Avenue he claims he was looking straight in front, but did not see a bicyclist.  As he drove along West 29th Street after crossing 9th Avenue he claims he looked to his right and forward, but still did not see any bicyclist. [Anticipated testimony of Clement]

43.     When Clement crossed over 9th Avenue he claims he could see everything between the perpendicular trailer and the windshield of his truck.  [Anticipated testimony of Clement]

44.     When Clement crossed over 9th Avenue, Marilyn Dershowitz was riding her bicycle in front of Clement between his truck and the perpendicular trailer, but he still claims he never saw her. [Pl. Ex. 1]

45.     Clement had very good visibility of West 29th Street due to the fact that he was higher up while seated in the 7-Ton postal truck than other vehicles on the roadway.  His truck contained a large rectangular windshield with no obstructions to block his view.  [Anticipated testimony of Genna; Pl. Ex. 1]

46.     As Clement drove west on West 29th Street, there was nothing blocking his view. He claims he looked for bicyclists, but did not see any.  [Anticipated testimony of Clement]

47.     Clement admitted that if a bicyclist was in the roadway ahead of him and he was scanning he should have seen the bicyclist.  [Anticipated testimony of Clement]

48.     Traffic was light and moving freely on West 29th Street when Clement was driving westbound. [Anticipated testimony of Clement; Pl. Ex. 1]

Silver Minivan

49.     When Clement crossed over 9th Avenue, a silver minivan was to his left. [Pl. Ex.

9

1; Anticipated testimony of Clement]

50.     The driver and owner of the silver minivan were never identified.  [Anticipated testimony of Rivera and Doerzbacher]

51.     Clement knew the silver minivan was to his left the whole time from the time he crossed over 9th Avenue to just prior to the happening of the accident. [Anticipated testimony of Clement; Pl. Ex. 1]

52.     Clement knew the road narrowed due to USPS trailers limiting the travel portion of the roadway. [Anticipated testimony of Clement]

<u>The Bump</u>

53.     As Clement drove past the perpendicular trailer protruding into the travel lane of West 29th Street, he felt a bump to the right rear wheel of his truck. [Anticipated testimony of Clement]

54.     The bump was Clement running over the bicycle and body of Marilyn Dershowitz. [Anticipated testimony of Genna]

55.     Between the time Clement pulled out after his 1 hour and 25 minute break and feeling the bump, he did not come to a stop.  [Anticipated testimony of Clement]

56.     Between the time Clement crossed over 9th Avenue and the time he felt the bump, he alleges he scanned the roadway to the left 4 times and to the right 4 times checking for bicyclists, but admits he never saw a bicyclist. [Anticipated testimony of Clement]

57.     Between the time Clement crossed over 9th Avenue and the time he felt the bump, he claims he checked his right mirror 4 to 5 times and his left mirror 4 to 5 times, but claims he never saw a bicyclist. [Anticipated testimony of Clement]

58.     When Clement passed the Morgan South exit, roughly halfway between 9th Avenue and the overpass, the silver minivan was still to his left and was distracting him. [Anticipated testimony of Clement; Pl. Ex. 13A]

59.     Clement claims the silver minivan was a distraction because the front right wheel of the van was very close to his front left wheel and he was concerned the minivan might hit his truck. Clement testified he was distracted by the minivan for 10 seconds, but never stopped in those 10 seconds.  [Anticipated testimony of Clement]

60.     The path of the silver minivan was blocked by the parallel trailer parked on the south side of West 29th Street. [Anticipated testimony of Genna; Pl. Ex. 1]

61.     Clement did not stop or yield to allow the silver minivan to proceed in front of him. [Anticipated testimony of Clement]

62.     Clement claims he kept the silver minivan under his constant observation. [Anticipated testimony of Clement]

63.     On the south side of West 29th Street at the exit of Morgan South is Security Post 4 for the USPS.  At the time Marilyn Dershowitz and Clement pass Post 4, Postal Police Officer Rosemary Jones was in the security booth. [Anticipated testimony of Postal Police Officer Rosemary Jones]

64.     Postal Police Officer Rosemary Jones wrote in a statement to the Manager of Human Resources for the New York District of the USPS that Clement and two other cars were "all vying to be the first one down the street." [Plaintiff's Exhibit 7]

65.     When Marilyn Dershowitz rode past Post 4, she was still in front of the 7-Ton truck being driven by Clement, just as she was when she crossed over 9th Avenue.  She had no

11

difficulty riding her bicycle.  [Pl. Ex. 1; Anticipated testimony of Jones]

66.    When Clement passed Post 4, he was still behind Marilyn Dershowitz with the silver minivan to his left. [Pl. Ex. 1]

67.    When Clement passed Post 4 the silver minivan was to his left and slightly ahead of his truck. [Pl. Ex. 1]

68.    Clement claims he slowed to allow the silver minivan to pass; however, Clement did not allow the silver minivan to pass him on the left as he later admitted and as the video showed.  Instead, Clement went ahead of the minivan. [Anticipated testimony of Rivera, Doerzbacher, Clement, Pl. Ex. 1]

69.    Clement claims he never changed lanes, merged or veered to the right between 9th Avenue and feeling the bump to his truck. [Anticipated testimony of Clement]

70.    Clement veered to his right as he traveled west on West 29th Street. [Anticipated testimony of Jones, Genna, Pl. Ex. 7]

71.    Postal Police Officer Rosemary Jones wrote in her statement via email that she saw the postal truck veer to the right and at the same time saw the pedestrian, who she later learned to be a woman riding a bicycle, hit by the truck. [Pl. Ex. 7]

72.    After the accident, Postal Police Officer Rosemary Jones ran to the scene and yelled into her radio "Woman hit by postal truck." [Anticipated testimony of Rosemary Jones]

73.    Detective Victor Rivera testified that Clement admitted he moved his truck to the right prior to the accident. [Anticipated testimony of Rivera]

74.    When Clement felt the bump he was looking to his left in the left side mirror. [Anticipated testimony of Clement]

75.    Clement had been looking at the mirror to his left and out the left side window for 6 seconds prior to the time he felt the bump to the back of his truck.  During this time, for 6 seconds, Clement was not looking or scanning to his right to observe the bicyclist who was there to be seen in front of and to the right of his vehicle [Anticipated testimony of Clement]

76.    When Clement felt the bump to the right rear of his truck, he did not press the brake, but kept going. [Anticipated testimony of Clement]

77.    As Clement drove by the trailer he looked in the right side mirror and saw the right side of his truck and the roadway along the right side of his truck but claims he did not see a bicyclist on the roadway.  [Anticipated testimony of Clement]

78.    When Clement moved his 7-Ton truck to the right he closed the space between the right side of his truck and the perpendicular trailer.  The right front portion of Clement's truck struck the left handle bar and hand of Marilyn Dershowitz causing the front wheel of her bicycle to pivot to the right and propel her to the left and onto the ground between the right front and right rear wheels of the truck.  The right rear wheels of the truck then ran over Marilyn Dershowitz and her bicycle.  [Pl. Ex. 16; Anticipated testimony of Genna]

79.    After the accident, while still proceeding under the overpass, Clement drove to the left and stopped then drove to the right side of the street and stopped but claims he did not know he struck anybody.  Although he did see a commotion in the area behind him he never got out of his truck to investigate. [Pl. Ex. 1; Anticipated testimony of Clement]

80.    Clement drove between the parked trailers first, in front of the silver minivan. The silver minivan passed through the trailers after Clement. [Pl. Ex. 1]

81.    After the accident, Clement drove into Morgan South, picked up mail and exited

13

the building.  When he exited the building he was directed to drive the wrong way on West 29th

Street to 9th Avenue because West 29th Street was closed due to the accident he had just caused.

Clement had heard that there was an accident while he was in Morgan South picking up mail.  He

delivered the mail to Radio City on 52nd Street and 8th Avenue, picked up more mail at Radio

City and delivered it to Morgan South.  On his way back from Radio City Clement thought he

might have been involved in the accident because he heard it involved a postal vehicle.  It was on

his way back from Radio City that it "dawned" on him that he might have been involved.  He

delivered the mail then drove to the VMF where he told his supervisor that he was at the location

of the accident at the time it was reported to have happened. [Anticipated testimony of Clement]

82.     Nathan Dershowitz, who had been stopped on West 29th Street at 10th Avenue,

realized his wife was no longer behind him.  He then  backtracked on West 29th Street and saw a

commotion in the roadway.  He then saw his wife Marilyn and her bicycle on the ground.

[Anticipated testimony of Nathan Dershowitz]

<u>Robert Genna</u>

83.     Robert Genna is the Director of the Suffolk County Crime Lab and an expert in

the field of accident reconstruction.  [Anticipated testimony of Robert Genna]

84.     On November 30, 2011, Robert Genna inspected and took measurements of West

29th Street between 9th and 10th Avenues, inspected and took measurements of the 7-Ton truck

Clement was operating, and inspected and took measurements of the trailer parked perpendicular

to the north curb.  [Anticipated testimony of Robert Genna]

85.     Robert Genna will offer the opinion that the left handle bar and hand of Marilyn

Dershowitz were struck by the postal truck between the right front corner and the right front

wheel well.  This caused her handle bars to pivot clockwise, immediately propelling her to the left and to the ground between the right front and right rear wheels and that she and her bicycle were subsequently run over by the right rear wheels of the postal truck.  He will offer the opinion that Clement was driving behind Marilyn Dershowitz, that she was riding at a slow rate of speed ahead of Clement and that striking her was a substantial factor in causing the accident. [Anticipated testimony of Genna]

86.     Robert Genna will further offer the opinion that Clement was not paying proper attention to that which was there to be seen and that had he been paying proper attention he would have seen Marilyn Dershowitz on her bicycle, allowed her to pass the perpendicular trailer first since she was in front of him and would have been able to avoid contact.  He will offer the opinion that Clement's failure to pay proper attention was a substantial factor in causing the accident. [Anticipated testimony of Genna]

87.     Robert Genna will further offer his opinion that the postal trailers parked on the north and south sides of West 29th Street created a dangerous and hazardous condition and in violation of the signage causing a bottleneck which forced all traffic into the narrowed roadway. He will offer his opinion that the positioning and improperly parked postal trailer on the north side was a substantial factor in causing this accident.  [Anticipated testimony of Genna]

<u>Marilyn Dershowitz</u>

88.     At the time of her death, Marilyn Dershowitz and Nathan Dershowitz were married.  They were married on December 29, 1963, in New York, New York.  [Stipulation]

89.     Marilyn Dershowitz, at the time of her death, was 68.34 years old with a statistical life expectancy of approximately 17.43 additional years.  She was born on February 27, 1943.

15

[Stipulation]

90.     Marilyn Dershowitz's husband, Nathan Dershowitz, was 69.16 years old at the

time of his wife's death with a statistical life expectancy of approximately 14.49 additional years

from the date of her death.  He was born on May 5, 1942.  [Stipulation]

91.     Adam Dershowitz is the son of Marilyn Dershowitz and Nathan Dershowitz.

Adam Dershowitz was born May 1, 1967. [Stipulation]

92.     Rana Dershowitz is the daughter of Marilyn Dershowitz and Nathan Dershowitz.

Rana Dershowitz was born May 5, 1970. [Stipulation]

93.     Marilyn Dershowitz was healthy, had not been hospitalized and did not have any

medical conditions that would adversely impact her life expectancy.  Marilyn Dershowitz's

mother is still alive and is 97 years old.  Her father died in his late 80s [Anticipated testimony of

Rana Dershowitz, Adam Dershowitz, and Nathan Dershowitz; Pl. Ex. 16]

<u>Work History of Marilyn Dershowitz and Future Employment as a Mediator</u>

94.     Prior to her death, the decedent had recently retired as a Special Referee for the

New York State Supreme Court, Civil Division, with many years of experience handling

matrimonial cases. [Anticipated testimony of Nathan Dershowitz, Harriet Newman Cohen]

95.     Her work as a Special Referee was widely respected amongst members of the

bench and the matrimonial bar.  [Anticipated testimony of Dershowitz; Harriet Newman Cohen]

96.     Mrs. Dershowitz continued to hold a seat on the State Bar Association's

matrimonial committee, and continued to speak frequently at matrimonial bar events.

[Anticipated testimony of Dershowitz; Harriet Newman Cohen]

97.     Her work at the Supreme Court was so well respected that when she announced

her retirement from the Supreme Court, Judge Sherry Heitler tried to persuade her to stay by offering her a bonus and the position of Chief Mediator for the Supreme Court.  [Anticipated testimony of Dershowitz]

98.     Mrs. Dershowitz declined the offer and opted to retire from the court at the end of 2010 so that she could pursue other work opportunities including establishing her own private mediation practice.  [Anticipated testimony of Dershowitz; Harriet Newman Cohen]

99.     Upon her retirement from the Supreme Court, Mrs. Dershowitz continued her work in the field and was recruited by a justice of the Appellate Division, First Department, and assisted the Appellate Division by mediating civil appeals in an attempt to settle the cases prior to oral argument.  [Anticipated testimony of Dershowitz]

100.     The mediation practice at the Appellate Division was volunteer work.  Mrs. Dershowitz agreed to help because she intended for this new work and experience to serve as a transition to her private mediation practice.  [Anticipated testimony of Dershowitz; Harriet Newman Cohen]

101.     She had been offered positions at several matrimonial firms to perform in-house mediation.  She had space available in her home which could serve as a home office for the mediation practice.  She had the option of renting a space to perform the mediation work, while doing the billing and administrative work from her home.  Finally, she had the option of joining JAMS - a mediation and arbitration firm - where she had contacts such as Judge Stephen Crane. [Anticipated testimony of Dershowitz; Harriet Newman Cohen]

102.     Mrs. Dershowitz was on the verge of establishing a private mediation practice just before her death.  She had received specific requests to mediate cases even before she could set

up the business.  Mrs. Dershowitz, who was very detailed oriented and deliberate, put off these offers for a couple months while she took the initial steps to set up the practice properly. [Anticipated testimony of Dershowitz]

103.    At that time, she began looking for office space, had discussions with judges and lawyers about the process, and networked with members of the matrimonial bar. [Anticipated testimony of Dershowitz; Harriet Newman Cohen]

104.    Attorney Harriet Newman Cohen is a founding partner of Cohen Rabin Stine Schumann LLP, a matrimonial and family law firm.  She estimated that the average mediator could make $450/hour, but that Marilyn Dershowitz would have easily commanded $600/hour performing mediation work, based on her experience and her reputation. [Anticipated testimony of Newman Cohen]

105.    Ms. Newman Cohen and Dershowitz had lunch together between August of 2010 and January of 2011 because both were at crossroads in their careers.  They discussed how Marilyn was leaving the courthouse, and how Newman Cohen tried to talk Marilyn into joining her firm.  If Marilyn joined Cohen's firm, Marilyn's pay rate would have been $225,000 because of her spectacular reputation.  [Anticipated testimony of Newman Cohen]

106.    Marilyn had her own ideas about working more as a mediator than as a matrimonial attorney.  Marilyn would be a talented and experienced mediator based on her experience in "knocking heads together" at the courthouse.  [Anticipated testimony of Newman Cohen]

107.    Marilyn Dershowitz had established credibility and integrity as a mediator because she was respected, well known, celebrated and had a strong work ethic.  Lawyers would

seek her out as a mediator and judges would recommend she resolve disputes.  [Anticipated

testimony of Newman Cohen]

108.    Cohen would have recommended her as a mediator to her matrimonial clients.

[Anticipated testimony of Newman Cohen]

<u>Economic Expert: Gary M. Crakes PhD</u>

109.    Gary M. Crakes is plaintiff's economic expert.  He received a PhD and Masters in

economics from the University of Connecticut and a Bachelors in economics from Central

Connecticut State College.

110.    Dr. Crakes will testify to the economic losses in the case as a result of the death of

Marilyn Dershowitz.  He will testify to her anticipated earnings as a private mediator assuming

different work life expectancies and different rates charged as a mediator.  Additionally, he will

testify to the economic losses with respect to the decedent's pension and social security.  He will

further testify as to the value of the loss of household services and other economic losses.

<u>Loss of Earnings</u>

111.    The loss of earning capacity has been calculated according to two different

scenarios with two earnings alternatives.  All earnings losses are calculated to commence on

January 1, 2012.  The two scenarios project losses assuming a work-life to age 75 and a work-life

to age 78.  The two earnings alternatives project losses to work-life age 75 and work-life age 78

assuming annual earnings of both $495,000 and $660,000.  The annual earnings estimates are

based on employment averaging 22 hours per week at alternative earnings rates of $450 per hour

and $600 per hour.  [anticipated testimony of Gary M. Crakes, PhD, Nathan Dershowitz and

Harriet Newman Cohen]

19

112.     With estimated annual earnings of $495,000 based on an earning rate of $450 per hour, undiscounted earnings loss is $2,800,717 with work-life to age 75 and $4,278,561 with work-life to age 78 assuming a future annual rate of growth of earnings of 2.00% per year and the deduction of business expenses. [anticipated testimony of Gary M. Crakes, PhD]

113.     With estimated annual earnings of $660,000 based on an earning rate of $600 per hour, undiscounted earnings loss is $3,734,289 with work-life to age 75 and $5,704,748 with work-life to age 78 assuming a future annual rate of growth of earnings of 2.00% per year and the deduction of business expenses. [anticipated testimony of Gary M. Crakes, PhD]

<u>Loss of Pension Benefit</u>

114.     Marilyn Dershowitz would have received a pension benefit for at least an additional 17.43 years, her remaining life expectancy.  Mrs. Dershowitz was receiving a monthly pension benefit of $7,558.30, or an annual pension benefit of $90,700.00.  The pension benefit was to be paid for her lifetime.  The annual pension benefit of $90,700.00 has an applicable cost of living adjustment of 1.00% per year commencing in 2016.  The undiscounted loss of pension benefit is $1,653,469.  In light of her family history, the fact that she was in excellent health, exercised and did not suffer from any chronic diseases, she would likely exceed the statistical life expectancy and would have continued to receive the pension benefit for life.  The pension benefit is subject to Federal tax withholding only. [anticipated testimony of Gary M. Krakes, PhD, Nathan Dershowitz, Rana Dershowitz, Adam Dershwoitz, and Plaintiff's Exhibit 17]

<u>Loss of Social Security Benefit</u>

115.     Marilyn Dershowitz would have received a social security benefit for at least an additional 17.43 years, her remaining life expectancy.  With an annual benefit of $21,864, in

2011, application of the annual cost of living adjustments for each year in the past, and the assumption of a 2.00% future annual rate of increase, the undiscounted loss of Social Security benefit is $458,101.  [anticipated testimony of Gary M. Krakes, PhD, Nathan Dershowitz, Rana Dershowitz, Adam Dershwoitz, and Plaintiff's Exhibit 18]

Personal Consumption

116.     A deduction of 20% of gross earnings, pension benefit and Social Security benefit is made as an allowance for personal maintenance expenses.  With this deduction and estimated annual earnings of $495,000, undiscounted economic loss becomes $3,929,830 with work life to age 75 and $5,112,105 with work-life to age 78.  With estimated annual earnings of $660,000, undiscounted economic loss becomes $4,676,687 with work-life to age 75 and $6,253,054 with work-life to age 78.

Loss of Household Services

117.     Marilyn Dershowitz regularly cooked for her husband, cleaned the apartment, shopped for groceries, did laundry and shared in the household duties and responsibilities.  With loss of household services estimated at 50% of the value of household services the estimate of undiscounted loss of $120,922 with the assumption of a future annual rate of growth of 2.00% per year.  [anticipated testimony of Gary Crakes, Nathan Dershowitz, Rana Dershowtiz, Adam Dershowitz]

Total Undiscounted Economic Loss of Earnings,<br>Pension Benefit, Social Security and Household Services.

118.     The undicounted loss in this case with estimated annual earnings of $495,000 is approximately $4,051,000 with work-life to age 75 and $5,233,000 with work-life to age 78.

21

With estimated annual earnings of $660,000, undiscounted economic loss is approximately $4798,000 with work-life to age 75 and $6,374,000 with work-life to age 78.

Loss of Parental Care and Guidance

119.     Rana Dershowitz and Adam Dershowitz are the daughter and son of Marilyn Dershowitz.  Despite Rana and Adam being adult children, they never stopped needing their mother's advice, guidance and support.  Marilyn Dershowitz was intimately involved in their lives and the lives of their children.   Both Rana and Adam sought their mother's guidance with respect to familial, social and career decisions, personal problems that could not be discussed with anyone else, and raising their young families.  In addition to seeking her guidance in such matters, Rana and Adam relied on their mother for assistance, support and encouragement in all aspects of life.  Marilyn Dershowitz gave freely in all respects to her children and put her children ahead of herself and her needs.

Conscious Pain and Suffering and Apprehension of Imminent Death

120.     Prior to the time that she was run over by the wheels of the 7-Ton truck, Marilyn Dershowitz suffered apprehension of imminent death. [Anticipated testimony of Genna]

121.     Following the impact, Marilyn Dershowitz gasped for air and at the same time Nathan Dershowitz squeezed her hand and she squeezed his hand back. [Anticipated testimony of Nathan Dershowitz]

122.     Marilyn Dershowitz died on July 2, 2011.

123.     Prior to the commencement of this action, and more particularly, on the 4th day of August, 2011, plaintiff, Nathan Dershowitz, was appointed executor of the estate of Marilyn Dershowitz and duly granted Letters Testamentary on the goods, chattels and credits of Marilyn

22

Dershowitz, deceased, by order of the Hon. Nora S. Anderson, New York County Surrogates's

Court, was duly qualified as such and is now acting in said capacity.

<u>PROPOSED CONCLUSIONS OF LAW</u>

Jurisdiction, Venue and Other Statutory Requirements

124.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 in that this action arises under the Constitution and laws of the United States and is

premised on the acts and omissions of defendant acting under the color of federal law as well as

pursuant to 28 U.S.C. § 1346 (b) (1) in that this is a claim against The United States of America

and agencies of The United States of America, for money damages, accruing on or after January

1, 1945, for wrongful death and conscious pain and suffering caused by the negligent and

wrongful acts and omissions of employees of the Government while acting within the scope of

their office or employment, under circumstances where The United States of America, if a

private person, would be liable to the plaintiff in accordance with the laws of the places where

the act or omissions occurred.

125.    Jurisdiction founded upon the federal law is proper in that this action is premised

upon causes of action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 (b), 1402

(b), 2401 (b), 2671-80.

126.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402 (b) because

Plaintiff resides in the Southern District of New York.

127.    This case is to be tried without a jury pursuant to 28 U.S.C. § 2402.

128.    Pursuant to the FTCA, 28 U.S.C. § 2671, et. seq., plaintiff, on or about November

8, 2011, presented his claim to the appropriate Federal agency for administrative settlement

under the FTCA pursuant to 28 U.S.C. § 2672, et. seq., and more than six months passed after

the filing of plaintiff's aforesaid claim yet it was not finally disposed of by the United States

Postal Service.  Subsequently, plaintiff's claim was denied by the agency and such denial was

sent in a writing dated December 17, 2012, by certified and registered mail to plaintiff and

plaintiff's counsel.

129.    This action was timely brought by Plaintiff pursuant to 28 U.S.C. § 2401 (b) in

that it was presented to the appropriate agency within two years of accrual and this action was

filed more than six months after the claim was filed.

Liability

130.    Pursuant to the FTCA, the Court is to apply the substantive law of the place where

the act or omission occurred.  Because the accident in question occurred in New York, New

York, the law of New York State governs the issues of liability and damages in this action.  (*see*

*e.g., Chen v. United States*, 854 F.2d 622, 626 [2d Cir. 1988];   *Holland v. United States*, 918 F.

Supp. 87, 89 [S.D.N.Y. 1996]).

131.    To prevail on a claim of wrongful death in New York, a "plaintiff must establish

'(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by

which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary

loss by reason of the death of decedent, and (4) the appointment of a personal representative of

the decedent'" (*Garcia v Dutchess County* , __ F.Supp.2d__, No. 11 Civ. 1466 SHS, 2014 WL

4116959, at *15 [S.D.N.Y. Aug. 21, 2014], quoting *Hollman v. Taser Int'l Inc.*, 928 F.Supp.2d

657, 683 [E.D.N.Y. 2013]).

132.    To establish that the defendant acted negligently under New York law, the

plaintiff must demonstrate the following by a preponderance of the evidence: (1) the defendant

owed him or her a duty of reasonable care; (2) a breach of that duty; and (3) a resulting injury

proximately caused by the breach (*see Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 199 [1[st]

Dept. 2013], citing *Boltax v. Joy Day Camp*, 67 N.Y.2d 617 [1986]).   The defendant has the

burden of proving any negligence on the part of the plaintiff by a preponderance of the evidence

(*see Kane v United States*, 189 F.Supp.2d 40, 52 [S.D.N.Y. 2002], citing 1B New York Pattern

Jury Instructions 2:275.1 [2000]).

133.   "The plaintiff in a wrongful death action based on negligence is not held to as

high a degree of proof as is required in a case where the injured person may take the stand and

give their version of the occurrence" (*Maura v. ACL Leasing, LLC*, No. 12 Civ. 8909, 2014 WL

7250952, at *3 [S.D.N.Y. Dec. 19, 2014], citing *Noseworthy v. City of New York* , 298 N.Y. 76,

78 [1948]).  The plaintiff's evidence will be "deemed sufficient to make out a prima facie case if

it shows facts and conditions from which the negligence of the defendant and the causation of the

accident by that negligence may be reasonably inferred" (*id*., quoting *In re Lattimore's Estate v.

Falcone*, 35 A.D.2d 1069, 1069 [4[th] Dept. 1970]).

134.   The movement of defendant's vehicle and plaintiff's decedent's bicycle when

traversing a roadway in the State of New York is governed by Title VII of New York's Vehicle

and Traffic Law, titled "Rules of the Road."  A driver who violates a specific standard of care set

forth in New York's Vehicle and Traffic Law (VTL) is deemed negligent as a matter of law (*see

Delgado v. Martinez Family Auto*, 113 A.D.3d 426, 427 [1[st] Dept. 2014];  *Elliott v. City of New

York*, 95 N.Y.2d 730, 734 [2001];  *Gray v. Wackenhut Svcs., Inc.* 721 F. Supp. 2d 282, 290

[S.D.N.Y. 2010]).  Once plaintiff establishes prima facie a violation of traffic law, the burden

25

shifts to the defendant to produce evidentiary proof showing that there was no violation of the

traffic law, or sufficiently offering a reasonable explanation or excuse for the violation (*see*

*Delgado*, 113 A.D.3d at 427).

Defendant's Vehicles Are Subject to the Rules of the Road

135.    Defendant's agency, the United States Postal Service, and its drivers, must comply

with the provisions set forth in Title VII of the VTL, which, subject to certain exceptions not

relevant to this case, are applicable to the drivers of all vehicles owned or operated by the United

States (*see* VTL § 1103 [a]).

Vehicle and Traffic Law § 1146 (a)

136.    "Notwithstanding the provisions of any other law to the contrary, every driver of a

vehicle shall exercise due care to avoid colliding with any bicyclist … upon any roadway and

shall give warning by sounding the horn when necessary" (VTL § 1146 [a]).  A "roadway" is

defined by VTL § 140 as "[t]hat portion of a highway improved, designed, marked, or ordinarily

used for vehicular traffic, exclusive of the shoulder and slope."

137.    Defendant's driver, Ian Clement, was under a duty "to keep a reasonably vigilant

lookout for bicyclists, to sound the vehicle's horn when a reasonably prudent person would do so

in order to warn a bicyclist of danger, and to operate the vehicle with reasonable care to avoid

colliding with anyone on the road" (*Palma v Sherman*, 55 A.D.3d 891, 891 [2d Dept. 2008]).  "It

is settled that a driver is negligent where an accident occurs because [he] has failed to see that

which through proper use of [his] senses [he] should have seen" (*Gray v. Wackenhut Svcs., Inc.*,

721 F. Supp.2d 282, 290, quoting *Duncalf v Swamsington* , 2007 WL 2387968, at *3 [S.D.N.Y.

2007], citing *Bolta v Lohan*, 242 A.D.2d 356, 356 [2d Dept. 1997]).

138.    If a driver of a motor vehicle, while failing to exercise due care in violation of VTL § 1146 (a), causes a bicyclist "serious physical injury," which is defined by the Penal Law to include  "physical injury ... which causes death," then "there shall be a rebuttable presumption that, as a result of such failure to exercise due care, such person operated the motor vehicle in a manner that caused such serious physical injury" (VTL § 1146[c] [1], [2]).

139.    Defendant's driver, Clement, breached his duty to take due care to avoid colliding with the decedent.  He failed to keep a reasonably vigilant lookout for bicyclists and did not see that which  he should have seen through the proper use of his senses, since plaintiff was clearly visible for a substantial amount of time before the accident while riding in front of him (*see Santana v. De Jesus*, 110 A.D.3d 561, 561-562 [1st Dept. 2013]).

140.    Defendant, while failing to exercise due care to avoid colliding with the decedent as required by VTL § 1146 (a), caused the decedent "serious physical injury" and therefore, it is presumed that the manner in which the defendant's driver operated his vehicle caused the plaintiff's death (*see* VTL § 1146 [c] [1], [2]).

<u>VTL § 1122-a</u>

141.    VTL § 1122-a provides that the "operator of a vehicle overtaking, from behind, a bicycle proceeding on the same side of a roadway shall pass to the left of such bicycle at a safe distance until safely clear thereof."

142.    Defendant violated VTL § 1122-a by failing to keep a safe distance when overtaking plaintiff's decedent from behind.  Such violation constitutes negligence per se and was a proximate cause of plaintiff's decedent's death (*see Delgado*, 113 A.D.3d at 427).

<u>Defendant Has No Excuse for Violating the VTL</u>

143.     Except where overtaking and passing on the right is permitted, the driver of a vehicle being passed or overtaken on its left by another vehicle. i.e., the silver minivan, must "give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle" (VTL § 1122 [b]). When considering a civil claim based on the violation of Section 1122, if there is an absence of proof that the overtaking vehicle gave an audible signal, it is for the fact-finder to determine whether reasonable care required an audible signal before attempting to pass (*see Penvose v. Nichele*, 55 A.D.2d 1052, 1052 [4th Dept. 1977]).

144.     Under VTL § 1123 (a) (2) and (3), the driver of a vehicle may overtake and pass upon the right of another vehicle only under the following conditions, as applicable to this case: "[u]pon a street or highway with unobstructed pavement not occupied by parked vehicles of sufficient width for two or more lines of moving vehicles in each direction;" or "[u]pon a one-way street, or upon any roadway on which traffic is restricted to one direction of movement, where the roadway is free from obstructions and of sufficient width for two or more lines of moving vehicles."  However, in all circumstances, the "driver of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting such movement in safety" (VTL § 1123 [b]).

145.     Defendant cannot demonstrate an excuse for its violation of the VTL by pointing to the interaction of its driver and the silver minivan operated by an unidentified driver, which took place around the time of the subject accident.  Defendant violated VTL § 1122 (b) when Clement failed to give way to the silver minivan, which was passing on Clement's left.

28

Moreover, Clement violated VTL § 1123 by attempting to overtake the minivan on the minivan's right, since the one-way street was neither sufficiently free from obstructions nor sufficiently wide enough for two or more lines of moving vehicles, and in any case, the conditions existing on the roadway at the time did not permit Clement's safe passage on the right (*see* VTL § 1123 [b][2], [3]).  Notably, the most significant obstruction that restricted the amount of available roadway was another one of defendant's trucks, i.e., a postal trailer improperly parked, which was, as set forth below, parked in such manner that it protruded perpendicularly into West 29th Street in an area that was plainly marked with "No Parking" signs.

<u>The Decedent Was Not Negligent</u>

146.    As a bicyclist riding on a roadway, the decedent was generally, "entitled to all the rights and bears all of the responsibilities of a driver of a motor vehicle" (*Palma*, 55 A.D.3d at 891, citing VTL § 1231).  Furthermore, she was "required to use reasonable care for ... her own safety, to keep a reasonably vigilant lookout for vehicles, and to avoid placing [herself] in a dangerous position" (*id*.).  Both the decedent and defendant's driver were required to obey the statutes governing traffic and each was entitled to assume the other would do so (*id*.).

147.    There is no evidence that the decedent was negligent in the operation of her bicycle, as the video surveillance from immediately prior to and during the accident showed that she was riding as near as practicable to the right hand side of the one-way roadway, maintained a reasonably vigilant lookout for vehicles, drove at a reasonably prudent speed, and avoided placing herself in an unnecessarily dangerous position (*see Palma*, 55 A.D.3d at 891).   To the extent she was in violation of any rule or law, such violation was not a proximate cause of the accident.

<u>Defendant Violated New York City Traffic Rules and Regulations</u>

148.    A violation of the New York City Traffic Rules and Regulations (Chapter 4 of Title 34 of the Rules of the City of New York [RCNY]) constitutes some evidence of negligence (*see Elliot v. New York*, 95 N.Y.2d 730 [2001]; *Rodriguez v. Cato*, 63 A.D.2d 922, 923 [1st Dept. 1978]).   The provisions of the RCNY apply to operators of vehicles owned by or used in the service of the United States Government (*see* 34 RCNY § 4-02 [d] [2]).   RCNY Rules and Regulations pertaining to, among other things, "[p]arking, standing, stopping and backing of vehicles," "[t]he prohibition or regulation of the use of any highway by particular vehicles or classes or types thereof or devices moved by human power," "[r]ight of way of vehicles," and "[r]egulation of the direction of the movement of traffic and the use of traffic lanes," and where inconsistent or in conflict with the comparable provisions of the VTL, supersede such VTL provisions (VTL § 1642 [a] [2], [3], [10], and [13]).

149.    Pursuant to 34 RCNY § 4-02 (c), "[n]o person shall operate a vehicle in a manner that will endanger any person." Defendant violated 34 RCNY § 4-02 (c) by operating its vehicle in a manner which endangered plaintiff's decedent.   The violation of this regulation constitutes some proof of defendant's negligence and was a proximate cause of the decedent's death.

150.    The New York City Traffic Rules and Regulations also provide that "[n]o person shall operate a vehicle in a manner which obstructs traffic in lanes specifically designated for the movement of traffic" (34 RCNY § 4-07 [b] [1]).   Furthermore, pursuant to 34 RCNY § 4-08 (a) (1), subject to certain exceptions not applicable to this case, "[n]o person shall stop, stand or park a vehicle, whether attended or unattended, other than in accordance with authorized signs,

30

pavement markings, or other traffic control devices."  "When official signs, markings or traffic control devices have been posted prohibiting, restricting or limiting the parking of vehicles, no person shall park any vehicle in violation of the restrictions posted on such signs, markings or traffic control devices" (34 RCNY § 4-07 [d]).

151.    In addition to defendant's truck that was driven by Ian Clement, another truck belonging to defendant was perpendicularly parked in a driveway in such a manner that a substantial portion of it extended into the right hand lane of West 29th Street, notwithstanding the posted official signs expressly prohibiting parking in such lane, therefore, violating of 34 RCNY § 4-07 (d).   Defendant's operation of this second truck "obstruct[ed] traffic in lanes specifically designated for the movement of traffic," violating 34 RCNY § 4-07 (b) (1).   These violations constituted evidence of defendant's negligence and were also a proximate cause of plaintiff's death, since the presence of the second truck in an area of the roadway specifically designated for the movement of traffic significantly reduced the width of the roadway where vehicles and bicycles could safely travel.

Common-Law Standard of Care

152.    Independent of any statutory or rule violation, defendant's driver was under a common-law duty to use the same degree of care that a reasonably prudent person would have used under the same circumstances.  He was required to keep a reasonably vigilant lookout for bicyclists, to sound the vehicle's horn when a reasonably prudent person would do so in order to warn a bicyclist of danger, and to operate the vehicle with reasonable care to avoid colliding with anyone on the road (*see* New York Pattern Jury Instructions 2:76A).

153.    Defendant breach his common-law duty of care by failing to keep a reasonably

vigilant lookout for bicyclists like the decedent, to sound his horn to warn the decedent of danger and to operate his vehicle with reasonable care to avoid a collision, and such breach was a proximate cause of the decedent's death.

Wrongful Death Damages

154.    Plaintiff, Nathan Dershowitz, as the executor of the decedent's estate, is a "personal representative" with standing to bring this wrongful death action to recover damages on behalf of the distributees (*see* New York Estate Powers and Trusts [EPTL] § 1-2.13 [defining "personal representative" to include an "executor"]; EPTL § 5-4.1; *see also Heslin v. County of Greene*, 14 N.Y.3d 67, 75 [2010]).

155.    Damages for a wrongful death claim are "measured by the effect of the wrongful act on the distributees – the pecuniary loss suffered by the individual distributees as a result of decedent's death" (*Hernandez v. New York City Health and Hosps. Corp.*, 78 N.Y.2d 687, 693 [1991]).  To establish a right to a wrongful death recovery, plaintiff need only show that one or more distributees had a reasonable expectation of future support from the decedent (*see Zelizo v. Ullah*, 2 A.D.3d 273, 273 [1st Dept. 2003]).  Pursuant to EPTL § 5-4.4, the damages as prescribed by EPTL § 5-4.3 are "exclusively for the benefit of the decedent's distributees and when collected, shall be distributed to the persons entitled thereto under [EPTL §] 4-1.1 [distribution of a decedent's estate when property not disposed of by a will]."

156.    The individual distributees who suffered pecuniary losses and who would be entitled to collect had the decedent died intestate are the decedent's surviving spouse, plaintiff Nathan Dershowitz, and her surviving children, Adam Dershowitz and Rana Dershowitz.

157.    There are four types of compensable loss captured by the general term

"pecuniary" injury: (1) the decedent's loss of earnings; (2) loss of services each survivor might have received from the decedent; (3) loss of parental guidance from the decedent; and (4) the possibility of inheritance from the decedent (*see Parilis v. Feinstein* , 49 N.Y.2d 984, 985 [1980], citing EPTL § 5-4.3; *see also Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 667-668 [1991]). "In determining what is 'fair and just compensation,' factors which have traditionally been considered include: the age, health and life expectancy of the decedent at the time of the injury; the decedent's future earning capacity and potential for career advancement; and the number, age and health of the decedent's distributees" (*Johnson v. Manhattan & Bronx Surface Tr. Operating Auth.*, 71 N.Y.2d 198, 203-204 [1988]).  In deciding the monetary losses to the distributees, the fact-finder should consider the character, habits and ability of the decedent, the circumstances and condition of the three distributees, the services that the decedent would have performed for them, the portion of the decedent's earnings that she would have spent in the future for the care and support of each distributee, the life expectancy of the decedent and the life expectancies of the three distributees (*see* New York Pattern Jury Instructions [PJI] 2:320; *Johnson v. Manhattan & Bronx Surface Tr. Operating Auth.*, 71 N.Y.2d 198, 203-204 [1988]).

158.    The pecuniary losses must also take into consideration the value of the intellectual, moral and physical training and education that the decedent would have given her two adult children, Adam Dershowitz and Rana Dershowitz, had the decedent lived (*see* PJI 2:320; *Leger v. Chasky*, 55 A.D.3d 564, 565 [2d Dept. 2008]; *McKee v. Colt Electronics Co., Inc.*, 849 F. 2d 46, 50-51 [2d Cir. 1988]).

159.    In general, "evidence of a decedent's gross income at the time of death is the standard to measure the value of income already lost and to measure the loss of future earnings

(*Johnson*, 71 N.Y.2d at 204, citing *Woodling v. Garrett Corp.*, 813 F.2d 543, 557-558 [2d Cir. 1987]).  However, in deciding the amount of monetary loss, the fact-finder may also take into account any increased earnings that the decedent would have received "where it is probable that such changes were forthcoming" (*Mono v. Peter Pan Bus Lines, Inc.*, 13 F.Supp.2d 471, 478 [S.D.N.Y. 1998]).  Plaintiff need not establish that the increase in earnings was certain, and evidence may be received as long as there is a sufficient probability of the future earnings (*id.*, citing *Wanamaker v. Pietraszek* , 107 A.D.2d 1020 [4th Dept. 1985]).  Contentions that the evidence put forward to establish future earnings is speculative go to the weight, not the admissibility of the evidence (*see Sinkov v. Americor, Inc.*, 419 Fed.Appx. 86, 90 [2d Cir. 2011], quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 [2d Cir. 1984]).

160.    Since this not an action for medical or dental malpractice, the earnings considered in connection with plaintiff's wrongful death claim must be based on the decedent's gross earnings and no consideration or deduction may be made for income taxes (*see Johnson*, 71 N.Y.2d at 204; *cf.* EPTL § 5-4.3 [c]; CPLR 4546).

161.    Life expectancy tables may be used in calculating pecuniary losses, but such tables are simply statistical averages and the fact-finder, upon consideration of "proof of the health, constitution, habits and mode of living of the person whose life expectancy is in question," may determine that the person would have lived longer than the life expectancy tables predict (*Gilliard v. New York City Health and Hosps. Corp.*, 77 A.D.2d 532, 534 [1st Dept. 1980]).

162.    When determining the amount that the decedent would have spent for the care and support of the three distributees, the fact-finder must consider the amount the decedent earned

per year prior to her death, the part of those earnings that the decedent contributed to the support

and care of each of the distributees and the pattern of those contributions, the decedent's

prospects for advancement, the condition of the decedent and the length of time she reasonably

would have been expected to continue working (*see* PJI 2:320).  The last factor – work life

expectancy – may be guided by reference to work life expectancy tables, but such information is

not controlling (*id.*).

163.    The pecuniary loss award may include the monetary value of the services that

would have been provided by the decedent for her spouse, Nathan Dershowitz, in the care and

management of the family home, finances and health (*see De Long v. County of Erie*, 60 N.Y.2d

296, 307 [1983], citing EPTL § 5-4.3).  Evidence, including expert testimony, may be admissible

to aid the fact-finder in evaluating the value of the decedent's services for the purpose of

determining the increased expenditures the surviving spouse will incur "to continue the services

that [the decedent] was providing or would have provided if she lived" (*id.*).

164.    In addition, a separate award should be made for the reasonable expenses paid for

by the distributees, or those of which they are responsible for payment, for the decedent's funeral

and the medical expenses incurred as a result of the accident (*see* PJI 2:320; EPTL § 5-4.3 [a]).

165.    When a wrongful death action is tried by the court without a jury, "a decision

awarding damages shall specify the applicable elements of special and general damages upon

which the award is based and the amount assigned to each element, including but not limited to

medical expenses, dental expenses, podiatric expenses, loss of earnings, impairment of earning

ability, and pain and suffering" (CPLR 4213 [b]).  Furthermore, in a wrongful death action like

this one not involving medical or dental malpractice, the court's decision as to future damages

35

should be itemized in accordance with CPLR 4111 (e), which requires a verdict to itemize the amounts intended to compensate for damages to be incurred in the future, setting forth the period of years over which such amounts are intended to provide compensation.  Also, the court must award the "full amount of the future damages, as calculated, without reduction to present value" (CPLR 4111 [e]).

### Survival Action Damages

166.    Separate from the wrongful death action authorized by EPTL § 5-4.1, plaintiff Nathan Dershowitz, as the personal representative of the estate of Marilyn Dershowitz, is entitled to bring a personal injury action on behalf of the decedent for the conscious pain and suffering she experienced from the moment of the accident to the moment of her death (*see* EPTL § 1-2.13; EPTL § 11-3.2 [b]; *Heslin v. County of Greene*, 14 N.Y.3d 67, 77 [2010]).

167.    Plaintiff need only meet the threshold burden of proving the decedent's consciousness for at least some period of time following the accident in order to justify an award of damages for pain and suffering (*see Cummins v. County of Onondaga*, 84 N.Y.2d 322, 324 [1994];  *see also Lopez v Gomez*, 305 AD2d 292, 293 [1st Dept. 2003];  *Cepeda v. New York City Health & Hosps. Corp.*, 303 A.D.2d 173 [1st Dept. 2003], citing *McDougald v Garber*, 73 N.Y.2d 246 [1989]).  This burden may be satisfied by direct or circumstantial evidence, so long as it does not amount to "[m]ere conjecture, surmise or speculation" (*id*., quoting *Fiederlein v. New York City Health & Hosps. Corp.*, 56 N.Y.2d 573, 574-575 [1982]).

168.    Mrs. Dershowitz exhibited signs showing that she possessed some level of cognitive awareness immediately following the accident before she died.  She was breathing, had a pulse, was blinking and gasping for air.  Plaintiff Nathan Dershowitz squeezed her hand and

she squeezed his hand back.  In light of the severity of injuries, Mrs. Dershowitz's estate is

entitled to compensation for the pain and suffering she experienced during this time period (*see*

*Glaser v. County of Orange*, 54 A.D.3d 997, 998 [2d Dept. 2008]).

169.    Reasonable funeral expenses of the decedent which are paid by the decedent's

estate – as opposed to those which have been paid or are owed by the surviving spouse or another

person in their individual capacity – are recoverable in a survivorship action (*see* EPTL § 11-

3.3[a];  *Montalvo v. Chiaramonte*, 74 A.D.3d 455 [1st Dept. 2010]).

Total Itemized Damages

170.    The estate of the decedent is entitled to the amounts set forth below for the

following items:

(a)    Decedent's conscious pain and suffering and apprehension of imminent death:

$ 500,000

171.    The three distributees sustained the following total amounts of pecuniary loss,

including loss of parental care and guidance, from the time of the decedent's death to the date the

court's decision is rendered:

(a)    Nathan Dershowitz:              $ [see 172(a)]

(b)    Adam Dershowitz:               $ 150,000

(c)    Rana Dershowitz:               $ 150,000

172.    The three distributees can be reasonably be expected to sustain the following

amounts of pecuniary loss, including loss of parental care and guidance, as a result of the death

of the decedent, from the date of the court's decision into the future:

(a)    Nathan Dershowitz:             $ 6,374,000 (to be divided into past and future losses at trial)

(b)    Adam Dershowitz:             $ 900,000

(c)    Rana Dershowitz:             $ 900,000

173.    The three distributees can reasonably be expected to sustain that future pecuniary loss for the following periods of time:

(a)    Nathan Dershowitz:             14.49  Years

(b)    Adam Dershowitz:             30     Years

(c)    Rana Dershowitz:             30     Years

174.    Funeral expenses were incurred in connection with the decedent's burial of $13,632.15.

Dated: New York, NY
       January 26, 2015

                        Respectfully submitted,

                        GAIR, GAIR, CONASON, STEIGMAN,
                        MACKAUF, BLOOM & RUBINOWITZ
                        Attorneys for Plaintiff

                        /s/ Ben B. Rubinowitz
                        Ben B. Rubinowitz
                        Peter J. Saghir
                        80 Pine Street - 34th Floor
                        New York, NY 10005
                        (212) 943-1090
                        speak2ben@aol.com
                        psaghir@gairgair.com