UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NATHAN DERSHOWITZ, Executor of the Estate
Of MARILYN DERSHOWITZ, deceased,

       **Plaintiff,**

   -against-

THE UNITED STATES OF AMERICA,

       **Defendant.**
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____   4/8/2015
DATE FILED:_____

**12-CV-08634 (SN)**

<u>**OPINION AND ORDER**</u>

**SARAH NETBURN, United States Magistrate Judge:**

   The plaintiff Nathan Dershowitz, as executor of the Estate of Marilyn Dershowitz, filed

suit against the defendant United States of America, pursuant to the Federal Torts Claim Act (the

"FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, for the alleged wrongful death of his wife,

Marilyn Dershowitz. Mrs. Dershowitz died on July 2, 2011, as a result of injuries she sustained

in a tragic bike accident that same day. The plaintiff alleges that Ian Clement, a U.S. Postal

Service (the "Postal Service") driver who was on-duty and driving a Postal Service truck (the

"Postal Truck"), collided with Mrs. Dershowitz, and that Mr. Clement was negligent in his

operation of his vehicle, causing the accident and her death. The plaintiff also alleges that the

Postal Service was negligent for its placement of a Postal Service trailer (the "Postal Trailer"),

which was directly adjacent to where the accident occurred, and protruded over the sidewalk and

into the street, obstructing traffic. In turn, the defendant alleges that Mrs. Dershowitz's own

actions were a superseding proximate cause of the accident, or, at the very least, a substantial

contributing factor.

   The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c), and the Court conducted a bench trial February 3, 2015 through February 13, 2015.[1] Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52. The Court finds the government 100% liable. Based on the conclusions below, the parties are directed to compute the final award, broken down into past and future amounts (discounted to present value), and submit their final calculations to the Court within 14 days of this opinion.

## FINDINGS OF FACT

The accident occurred at approximately 11:59:52 a.m., on Saturday, July 2, 2011, on West 29th Street between Ninth and Tenth Avenues in Manhattan, New York. The contested events span from 11:59:38 a.m. to 11:59:52 a.m., no longer than fourteen seconds.

Four video cameras, attached to Postal Service facilities to the north and south of the accident, captured different angles of the relevant portion of 29th Street within the time period in question. They did not capture every portion of the roadway, however, and did not capture the area of the actual impact or Mrs. Dershowitz in the crucial seconds surrounding the accident. The Postal Truck driver, Mr. Clement, was beyond the Court's subpoena power and did not testify at trial, although portions of his September 27, 2013, deposition testimony were entered into evidence.

---

[1] On January 26, 2015, the parties submitted their proposed findings of fact and conclusions of law. (ECF Nos. 52-53.)

I.     **The Day of the Accident**

    A.     **Layout of West 29th Street Between Ninth and Tenth Avenues**

    The accident occurred on West 29th Street between Ninth and Tenth Avenues. Twenty-Ninth Street runs east to west and, on that block, is a single lane street, although there is room for two cars to drive side-by-side for the first 175 feet of the street. (Tr. 165:7-8; Pl's Ex. 14E). The street is thirty-four feet wide curb-to-curb. (Tr. 323:20-21.) There is no standard width for a single lane street in New York City, but dual or multi-lane roads are required to be delineated by white dotted lines, which 29th Street does not have. (Tr. 326:23-327:14; Clement Dep. 107:8-12.) The street has no bike lane. (Id. at 143:2-4.)

    Postal Service facilities known as the Morgan Mail facilities extend the length of the block on both the south and north sides of the street. (Tr. 51:17-22; Pl's Ex. 14E.) One hundred and seventy-five feet from the west curb of Ninth Avenue, there is an overpass above 29th Street that connects the two Morgan Mail facilities. (Tr. 475:14-18, 478:4-7; Pl's Ex. 14E.) On the day of the accident, up until the overpass, there were no vehicles parked on either side of the street. (Pl's Ex. 14E.) Mr. Clement stated that a sign on the overpass indicated that the speed limit was five miles an hour. (Clement Dep. 111:17-112:6.)

    Looking west on 29th Street from Ninth Avenue, there are two no parking signs affixed to the overpass above the southern (left) and northern (right) curbs. (Tr. 478:19-479:9; Gov't Ex. 23.) See also Appendix A. The signs were posted by the Postal Service. (Tr. 479:6.) On the southern (left) side of the overpass, the sign states: "THIS SIDE OF THE STREET U.S. POSTAL TRAILER PARKING ONLY." (Tr. 59:15-18; Gov't Ex. 23.) Under the sign and continuing westward, U.S. Postal Service trailers were parked, in a row, parallel to the southern curb and the flow of traffic. (Tr. 315:21-24; see Trailer labeled "019" in Pl's exhibit 14Q.) These

trailers were eight feet wide and parked a couple of inches from the curb. (Tr. 322:17-18.) They are parked there "constantly." (Clement Dep. 108:14-18.)

On the northern (right) side of the overpass, the sign states: "THIS SIDE OF THE STREET NO PARKING AT ANY TIME. TOW AWAY ZONE." (Tr. 60:2-3; Gov't Ex. 23.) Under this sign, the relevant Postal Trailer was backed into a loading dock, perpendicular to the street: it blocked the curb entirely and extended south six feet and three inches into the street. (Tr. 54:23-55:24, 315:21-24, 316:7-11, 321:24-322:1; Pl's Exs. 3C, 14Q, 14S.) See also Appendix B. Mr. Clement, Postal Police Officer Rosemary Jones, and New York Police Department Officer Scott Doerzbacher all stated that the Postal Service trailers were regularly parked in such a manner. (Tr. 57:11-13, 61:1-5, 316:20-317:6; Clement Dep. 109:24-110:6.) The Postal Trailer was 200 feet from the west curb of Ninth Avenue, or 25 feet past the beginning of the overpass. (Tr. 475:21-23.)

One effect of the Postal Trailer's positioning was that pedestrians on the northern (right) sidewalk or bikers on the right side of the street would have to go around the trailer, or more than six feet left into the roadway, to continue down 29th Street. A second effect of the Postal Trailer was that, in conjunction with the trailers parked parallel to the curb on the southern side of the street, it narrowed the roadway from its unobstructed width of 34 feet to no more than 19 feet and nine inches. (Tr. 326:1-3.) As a result, traffic had to funnel, or merge, into one center lane to continue down 29th Street – whereas cars were able to drive side-by-side on the previous 29th Street block, which is multi-laned, or even on the same block of 29th Street before reaching the overpass. (Tr. 58:20-59:5, 281:15-18; Pl's Ex. 14Q.)

There are three other pertinent markers on the southern (left) side of 29th Street before the Morgan Mail overpass. First, there is a storm drain 65 feet west of the Ninth Avenue

intersection. (Tr. 489:7-9.). Second, there is a square window in the southern cement wall of the Morgan Mail facility, past the storm drain. (Pl's Ex. 14E; Appendix B.) This is a security personnel station, known as "Post 4." (Tr. 53:13-23; Pl's Ex. 14E.) Third, just west of Post 4, but before the overpass and the parallel parked trailers, is a driveway. (Tr. 53:24-54:1; Pl's Ex. 14E.) This is an exit-only driveway for Postal Service vehicles. (Tr. 54:7-9.) To enter the southern Morgan Mail facility, vehicles continue west on 29th Street, under the overpass, to a driveway entrance that is closer to Tenth Avenue, then loop back – or east – within the building, and exit through the driveway next to Post 4. (Tr. 54:10-18; Clement Dep. 101:22-102:11.)

### B.    Before the Accident on July 2, 2011

#### 1.    Mr. and Mrs. Dershowitz

On July 2, 2011, the Saturday of the July 4th holiday weekend, the Dershowitzes set out from their apartment for a bike ride. (Tr. 160:20, 161:9-10.) Mrs. Dershowitz was a "very comfortable" and avid biker. (Tr. 161:23-162:14.) Mr. Dershowitz testified that, "she was meticulous about abiding by the rules and regulations, making sure that she always rode to the right, [and] stopped at stop signs. If there was anything that you had [to] yield, she would yield . . . ." (Id.) She regularly biked to and from work during the week, and the couple would ride together a couple of times a week, as well. (Tr. 161:23-162:5-14.) Mrs. Dershowitz rode a 26-inch Fuji bike with thick tires, although not as thick as those on a mountain bike. (Tr. 162:15-21.) Her bike had reflectors on each pedal and under the seat in back. (Tr. 164:1-4.) It also had a bike basket, which she often used to pick up groceries on the way home from work. (Tr. 173:6-8.) Mr. Dershowitz rode a standard 28-inch hybrid bike. (Tr. 163:3-4) The Dershowitzes had serviced both of their bicycles that spring. (Tr. 163:8-13.)

It was a "very pretty, sunny, nice Saturday" with dry road conditions. (Tr. 164:16-20; Clement Dep. 98:15-99:7.) Their plan was to bike to the West Side promenade along the Hudson River where "Marilyn had never ridden." (Tr. 164:24-25.) They set out from their apartment in Tudor City, located between 40th and 44th Streets and between First and Second Avenues in Manhattan. (Tr. 160:10-12.) Their first stop was a bicycle shop to check the air pressure in their bicycle tires. (Tr. 163:16-19.) They then biked down Second Avenue and continued across, or west, on 29th Street. (Tr. 165:4-6, 11.) Both Dershowitzes were wearing bicycle helmets. (Pl's Ex. 1.)

On 29th Street between Second and Fifth Avenues, there were few to no cars. (Tr. 165:22-25.) Between Fifth and Sixth Avenues, there were some commercial vehicles, and by Ninth Avenue, there were fewer cars again. (Id.) When Mr. Dershowitz reached the intersection of 29th Street at Ninth Avenue, he biked through it before the light changed and continued west to Tenth Avenue. (Tr. 167:6-15.) To pass the Postal Trailer protruding from the right and into the street, he looked to his left to see if any vehicles were coming, moved left towards the middle of the road to pass the Postal Trailer, and then moved back to the right hand side of the road. (Tr. 171:20-24.) Meanwhile, Mrs. Dershowitz had stopped at the Ninth Avenue intersection at a red light. (Tr. 167:6-18.)

### 2.    Mr. Clement and the Postal Truck

On the day of the accident, Mr. Clement was driving the 25-foot long and eight-foot wide Postal Truck. (Tr. 479:24-480:8; Pl's Ex. 12A.) The Postal Truck had six wheels: two in front and four in back, two side-by-side on both the left and right. (Clement Dep. 59:21-60:7.) The Postal Truck also had four mirrors: a flat and round mirror on each side. (Id. at 60:11-21.) Sitting in the cab and looking into the flat mirror, Mr. Clement could see the ground from where the

Postal Truck's box began, right behind the cab, all the way to the end of the box. (Id. at 63:18-64:6.) The round mirror allowed him to see farther out, and to the sides, of the Postal Truck. (Id. at 65:11-21.) In the cab, Mr. Clement sat about seven to eight feet above ground level. (Tr. 514:19-21.) The cab has a large front windshield with a panoramic view that allows a driver to "see great distance not only straight ahead of [him], but also down to the ground." (Tr. 334:5-8, 515:4-8, 523:18-23; Pl's Exs. 14F, 14M.)

Mr. Clement had driven a seven-ton postal truck, like the Postal Truck, for five years before the accident and had been a driver for the Postal Service since October 1988. (Clement Dep. 13:21, 21:8-21, 25:14-18.) Before that, he was a driver for Alexander's Department Store, where he also drove a seven-ton truck for five or six years. (Id. at 14:9-25; 16:21-17:2.) As part of his driver training, he was taught methods for scanning the road, "to try to get the big picture . . . [to] scan the area for motor vehicles, pedestrians," and bicyclists. (Id. at 26:11-21.) He was taught to "constantly check [his] side mirrors [], every five or six seconds," and to look through the windshield ahead of him and to the left and right through the side windows. (Id. at 26:25-27:2, 29:6-13, 32:14-17, 69:15-70:12.) He had picked up and dropped off mail at the Morgan Mail facility, and driven down 29th Street to do so, hundreds of times in his career. (Id. at 100:2-101:5.) While driving, he also saw bicyclists on a daily basis, and his custom was to slow down and to move into a different lane to pass bicyclists to ensure a safe distance between them and his truck. (Id. at 129:2-11, 129:24-130:8, 131:2-12, 132:17-25.)

On July 2, 2011, the Postal Truck "was in proper working order." (Tr. 333:23-24; Clement Dep. 85:6-9, 96:24-97:23.) Mr. Clement started work at 9:00 a.m., and made his first trip to Peter-Stuy Station to pick up mail at 9:30 a.m. (Clement Dep. 80:8-13, 114:6-10.) He then returned to Morgan Mail facility to drop off mail around 10:15 a.m. (Id. at 115:20-25.) He drove

west on 29th Street, and entered Morgan Mail South through the entrance closer to Tenth Avenue. (Id. at 116:14-24.) He next exited the building from the 29th Street driveway near Post 4, and proceeded to drive west to Eleventh Avenue, and then onto 28th Street between Tenth and Eleventh Avenues, where he stopped for breakfast. (Id. at 119:2-22.) He next drove to 29th Street between Eight and Ninth Avenues, where he parked for an hour and 25 minutes and took a nap. (Id. at 120:9-20; 126:15-23.) He then resumed his route, heading west to again enter Morgan Mail South.

  **C.**  **The Approach**

  At 11:59:38 a.m., Mrs. Dershowitz had just passed through the Ninth Avenue intersection and was adjacent to the northwest curb of 29th Street and Ninth Avenue. (Tr. 485:6-486:9; Pl's Exs. 1A, 1B.) She was "well in control of her" bicycle and "traveling on the right side of the road," "fairly close to the curb," continuing west down 29th Street. (Tr. 485:10-14.) At 11:59:44 a.m., the Postal Truck passed the same location with a silver minivan to its immediate left. (Tr. 486:18-487:20; Pl's Exs. 1C, 1D.) At 11:59:46 a.m., Gina Costa's red vehicle passed the same location, closer to the southern curb, behind and to the left of the Postal Truck. (Tr. 295:2-14, 490:10-17; Pl's Exs. 1E, 1F.) At 11:59:47 a.m., Ahmed Benomar's yellow taxi, transporting passengers Jessica Sunshine and her husband Sean Hopkins, passed, closer to the northern curb, behind and to the right of the Postal Truck. (Tr. 491:4-12; 492:11-16; Pl's Ex. 1G.) Using the northwest curb as a marker, Mrs. Dershowitz was six seconds ahead of the Postal Truck, eight seconds ahead of Ms. Costa's car, and nine seconds ahead of the taxi.

  At 11:59:42 a.m., Mrs. Dershowitz was still riding westbound, "about four feet from the north curb" and across from the storm drain, "in complete control of her" bicycle. (Tr. 493:3-6, 494:11-17; Pl's Ex. 1H.) The available street-bed was still 34-feet wide. (Tr. 494:20-22.) Only

four seconds later, at 11:59:46 a.m., the Postal Truck passed the same location, adjacent to the storm drain. (Tr. 495:2-9; Pl's Ex. 1I.) Mr. Clement was looking out the window to his left (south). (Clement Dep. 161:10-13.) The silver minivan cannot be seen in this footage, presumably blocked by the Postal Truck. At 11:59:48 or 49 a.m., Ms. Costa's red car passed the same location, almost in the center of the roadway. (Tr. 496:2-10; Pl's Ex. 1L.)

At 11:59:48 a.m., the Postal truck passed Post 4. At that moment, the silver minivan was very close to the Postal Truck's southern (left) side, and slightly ahead of the truck. (Tr. 499:13-21, 502:6-12; Pl's Ex. 1M.) At 11:59:49 a.m., Ms. Costa's red car passed Post 4, and the taxi was behind it and to the right (north). (Pl's Exs. 1N, 1O.) Mr. Clement testified that after he noticed the silver minivan to his left, he was "constantly" looking in his left hand mirror because the minivan was "moving fast and coming closer and closer" to his vehicle. (Clement Dep. 147:14-20, 148:16-17.) He stated that he had been driving at a constant rate of speed but took his foot off the accelerator when he saw the minivan. (Id. at 160:20-23, 162:9-16.)

In a short distance, due to the parallel parked trailers to the south and the protruding perpendicular Postal Trailer to the north, cars would not be able to travel side-by-side: the Postal Truck or silver minivan would need to yield to allow the other to go first. (Tr. 501:1-20.) From Post 4, Officer Jones testified that she saw Mrs. Dershowitz "riding her bicycle, and at the same time the vehicles were [] going into the narrow roadway," competing to be first. (Tr. 70:17-71:8, 105:12-14.) She testified that the Postal Truck "didn't slow down." (Tr. 74:1-3.) Ms. Costa testified that from her position, to the left of and behind the Postal Truck, all of the vehicles (including her own and the Postal Truck), were veering to the right to be able to fit into the roadway. (Tr. 682:18-20, 711:1-11, 717:16-18; Pl's Exs. 1S, 1T, 1U.) Although the Postal Truck

had been slightly behind the silver minivan at 11:59:48 a.m., the Postal Truck entered the

narrowed roadway first. (Tr. 501:16-19; Pl's Ex. 1.)

### D.    The Accident

At 11:59:51 a.m., the Postal Truck was directly under the overpass, with its back end just

passing beneath it. (Tr. 504:19.) Measuring from the front edge of the overpass, the Postal

Trailer was situated 25 feet away, and a blood stain from the accident was located 29 feet away.

(Tr. 505:3-506:13; Pl's Exs. 3C, 14T.) Thus, at 11:59:51 a.m., the moment the 25-foot long

Postal Truck fully passed under the overpass, the front of the truck would be four feet from

where, later, that blood would rest. The taxi was on the right side of the road, adjacent to the

storm drain, and Ms. Costa's vehicle was in front of and to the left of the taxi. (Tr. 503:23-25,

521:6-11; Gov't Ex. 31.)

Ms. Sunshine testified that she was seated in the back seat of the taxi and a little bit

toward the center, directly behind the Postal Truck. (Tr. 596:14-17, 598:9-11.) Because she was

interested in directions and street signs, she was looking forward, or west, through the center

console window separating the driver from the passengers, and out the front windshield.

(Tr. 596:21-23, 597:2-4.) Her husband was behind the passenger seat. (Tr. 596:19.) She was not

looking to her left. (Tr. 607:16.) The taxi was travelling toward the right northern side of the

street. (Tr. 598:7-8.) She saw a bicyclist, Mrs. Dershowitz, in front and to the right of her taxi.

(Tr. 598:18-20.) She also saw the Postal Trailer protruding into the street in front of her.

(Tr. 599:10-11.)

Ms. Sunshine testified that Mrs. Dershowitz continued to bike westward but had to veer

left to continue around the Postal Trailer. (Tr. 620:10-13.) Although the taxi was facing west,

Ms. Sunshine explained that Mrs. Dershowitz had been "coming out to go around [the Postal

Trailer] . . . so she wasn't exactly, we weren't all exactly facing forward." (Tr. 620:10-13.) Ms.

Sunshine testified: Mrs. Dershowitz "caught my attention because I was concerned that she was

losing her balance. I saw her put down her left foot off the pedal . . . . Then she picked up her left

foot, but she still wasn't balanced. She put her foot back on the pedal but she still wasn't

balanced, and she proceeded to ride even though she was off balance." (Tr. 599:17-600:4,

615:11-15, 621:16.) Ms. Sunshine did not know why Mrs. Dershowitz lost her balance but

watched her "try to steady herself." (Tr. 615:7-12.)

By then, the Postal Truck seemed to be merging to the right, into the taxi's lane; the

Postal Truck and Mrs. Dershowitz were directly to the left of the Postal Trailer. (Tr. 600:21-22,

601:16-17, 609:3-4, 11-12.) Ms. Sunshine saw Mrs. Dershowitz "list" to the left, and she gasped,

covering her eyes, not wanting to witness what was about to happen. (Tr. 600:5-6, 615:1.) As a

result, she did not see whether or how the Postal Truck hit Mrs. Dershowitz. (Tr. 614:15-615:7.)

The Court finds Mrs. Sunshine credible. She also was the only credible witness to have an

uninterrupted line of sight to Mrs. Dershowitz.

From her car behind and to the left of the Postal Truck, Ms. Costa caught sight of Mrs.

Dershowitz when "she was already going down. She wasn't high, she was inches from the floor."

(Tr. 691:8-10.) She could not see the front of the Postal Truck or what made Mrs. Dershowitz

fall. (Tr. 691:18, 707:18.) Mrs. Dershowitz and her bicycle ended up "in between the right front

tire and the right rear tire" of the Postal Truck. (Tr. 534:10-25.) Ms. Costa saw the Postal Truck's

rear wheels run over Mrs. Dershowitz's lower back, upper back, and shoulders. (Tr. 690:23-25,

691:8-10, 692:16-18.)

When Ms. Sunshine opened her eyes, she saw the cyclist laying on the ground, still

mounted on her bike. (Tr. 601:8-10.) Video footage taken under the overpass and facing east

shows the Postal Truck passing that point and proceeding down the Street. (Pl's Exs. 1, 1P.) It also appears to show that, at 11:59:52 a.m., the Postal Truck's rear right (northern) tire rose and then fell. (Tr. 502:23-503:16, 509:4-510:10; Pl's Exs. 1, 1X.) This "bump" is presumed to be the Postal Truck's tire rolling over Mrs. Dershowitz and her bicycle. (Tr. 503:9-16.)

      **E.**     **Post-Accident**

          **1.**     **Mr. Clement and The Postal Truck**

Mr. Clement testified that when he felt the bump, he had been looking to his left and in the left-side mirror, towards the minivan, for six seconds. (Clement Dep. 160:24-161:19.) He described being distracted by the silver minivan for more than ten seconds. (Id. at 170:4-13.) During the time he was distracted, he never saw a bicyclist. (Id. at 150:16-151:24.) He felt the Postal Truck rock side to side, and he thought he may have "r[u]n over a small object." (Id. at 166:7-18.) He looked in the right-side mirror and saw the truck's box and the ground but did not see a bicyclist. (Id. at 163:8-164:4.)

At 12:00:00, he stopped his Truck next to the parallel parked trailers on the southern (left) side of the street. (Id. at 176:20-177:6; Tr. 508:1-5.) At 12:00:04 a.m., the silver minivan came from behind and passed the Postal Truck on the right. (Tr. 508:1-5; Pl's Ex. 1Q.) In his right-side mirror, Mr. Clement did not see anyone on the ground but saw only cars. (Clement Dep. 178:18-179:7.) No one approached him, and he did not get out of his truck. (Tr. 280:17-18, 282:3-10. Pl's Exs. 8, 12D, 14G; Clement Dep. 166:3-19.) At 12:00:25 a.m., he pulled forward but because the honking had increased, he stopped again on the right side of the street for two to three minutes. (Tr. 286:2-10; Clement Dep. 179:18-180:19, 181:4.) He then proceeded west, made a left into Morgan Mail South, looped back east within the building, and exited the driveway by Post 4, where he was told to proceed east (the wrong way down 29th Street)

because a serious accident had occurred. (Tr. 282:6-10, 288:4-8, 289:12-22; Clement Dep. 183:13-24.) Mr. Clement proceeded to pick up mail at Radio City Station, after which it occurred to him that his Postal Truck may have been involved in the accident. (Id. at 190:22-191:10.) He returned to the Morgan Mail facilities to ask his supervisor about the accident. (Tr. 277:15-25, 289:16-20; Clement Dep. 183:13-24, 187:7-12.)

At his deposition, Mr. Clement stated numerous times that, before and after crossing Ninth Avenue, he never saw a bicyclist, and he never told anyone that he had seen a bicyclist. (Id. at 77:23-78:4, 139:2-19, 142:13-16, 150:16-151:24, 153:20-25, 156:1-6, 169:23-170:3.)

### 2.    At the Scene

On duty at Post 4 at the time of the accident, Officer Jones saw the Postal Truck bump over what she believed to be the bicyclist and ran out of the post. (Tr. 51:5-10, 90:13-15.) She saw Mrs. Dershowitz laying in the street and radioed headquarters: "pedestrian hit by postal truck." (Tr. 92:18-20, 93:16-17.) Ms. Sunshine stopped the taxi she was in. (Tr. 601:12-13, 710:3-5.) Her husband called 911, while she paid the fare, and Mr. Benomar drove away. (Tr. 601:12-13, 661:17-20.) Ms. Costa also immediately pulled over to the right, past Mrs. Dershowitz's body. (Tr. 692:24-693:4.) Her passengers got out of her car and yelled for the Postal Truck to stop. (Tr. 700:8-9.)

Ms. Costa went to Mrs. Dershowitz. (Tr. 681:18, 693:4-10.) Ms. Costa has been trained in CPR, advanced CPR, and first aid for the past fourteen years for volunteer work she did at a senior center. (Tr. 681:13-18.) She also has medical experience because her daughter has a heart condition known as tachycardia, which is "a racing of the heart, [] uncontrollabl[y]." (Tr. 714:20-715:7.) Ms. Costa testified that Mrs. Dershowitz was still on her bicycle and was not moving. Her torso, chest, and face were facing down on the pavement. (Tr. 693:5-17.) Ms. Costa pulled

Mrs. Dershowitz's right shoulder back and leaned her sideways in an attempt to keep her airways clear. (Tr. 693:23-694:1, 712:14-15.) Mrs. Dershowitz was "bleeding out of her ears, nose, and mouth" and gasping for air. (Tr. 693:19-694:1.) Ms. Costa checked Mrs. Dershowitz's pulse, and it was beating rapidly. (Tr. 694:18-24, 714:20-715:13.)

Meanwhile, when Mrs. Dershowitz had not reached Tenth Avenue, Mr. Dershowitz looked back and saw a commotion. (Tr. 171:1-11.) He turned around and quickly biked back. (Tr. 171:7-8.) Ms. Costa testified that Mr. Dershowitz arrived a "couple of minutes" after the impact. (Tr. 697:1-4.) Mrs. Dershowitz's heart was still beating, but it was slowing down. (Tr. 714:16-19, 697:18-22.) Mr. Dershowitz saw his wife's "mangled bike" and Ms. Costa cradling her. (Tr. 172:6-11.) He kneeled with Mrs. Dershowitz and held her hand. (Tr. 172:9-18.) He took off her glasses and touched her shoulder and upper arm. (Tr. 714:3-4.) He testified, "I told her I loved her and I told her that she's a fighter, that she'll make it through. I told her that the ambulance was coming. . . . She was making noises, but I couldn't tell what the words were, what she was saying or even whether it was verbalization, but there were some sounds coming from her mouth." (Tr. 121:2-6, 172:15-18.) He continued, "I squeezed her hand. There was a response, there was a squeeze by her right [hand,] which I took to be an acknowledgment of what I was saying and my squeezing of her hand." (Tr. 172:23-25, 175:13-16.)

Mrs. Dershowitz did not speak and, other than blinking and squeezing Mr. Dershowitz's hand, did not move her body in any way. (Tr. 694:4, 14-20.) Ms. Costa testified that from the time of the accident, when she kneeled next to Mrs. Dershowitz, until the ambulance arrived, she repeatedly took Mrs. Dershowitz's pulse. (Tr. 697:18-698:1.) Although Ms. Costa initially "couldn't even count what her pulse was" because it was so rapid, it then slowed drastically. (Tr. 697:18-698:3.) At some point, one to three minutes before the ambulance arrived, Ms. Costa

could no longer detect a pulse. (Tr. 698:2-18.) The Court found Ms. Costa's testimony regarding her observations of Mrs. Dershowitz and her own experience during that time credible.

The parties stipulated and agreed that when paramedic Timothy Boyle reached Mrs. Dershowitz, at 12:06:22 a.m., she was not conscious and lacked a pulse or respiration. (Tr. 676:1-8.) She never regained consciousness. (Id.) Mr. Boyle moved Mrs. Dershowitz's bicycle away from her immediate position to permit him to better treat her. (Id.) An ambulance transported Mrs. Dershowitz to Bellevue Hospital Center where she died. (Tr. 176:8-10, 177:21-178:8.)

Four feet from the eastern edge of the Postal Trailer, or 29 feet after the overpass, a pool of Mrs. Dershowitz's blood remained on the roadway. (Tr. 506:4-5; Pl's Exs. 3C, 14T.) One of the bicycle's reflector lenses was pulverized, and its remnants lay on the ground. (Tr. 528:6-8, 532:22-533:1; Pl's Exs. 14U, 14Y, 14V.) Scrape marks of metal on asphalt could be seen in a forward, westward trajectory parallel to the Postal Trailer's end. (Tr. 528:9-16; Pl's Ex. 14Y.) An autopsy report revealed that Mrs. Dershowitz suffered fractures to her skull, ribs, and sacroiliac joint, in addition to other contusions, abrasions, and hemorrhaging. (Tr. 535:15-20; Pl's Ex. 16.) The report states that Mrs. Dershowitz appeared to be a "well-nourished, 5'1", 110 pound" woman "whose appearance is younger than the reported age of 68." (Pl's Ex. 16.)

### 3.   Additional Testimony

#### i.   New York Police Department Detective Victor Rivera

Later that afternoon, New York Police Department Detective Victor Rivera arrived at the scene of the accident. (Tr. 314-15.) Detective Rivera is part of the Accident Investigation Squad, which investigates accidents involving serious physical injuries or fatalities. (Tr. 276:2-9.) He and a Manhattan Assistant District Attorney interviewed Mr. Clement when he returned to Postal Service headquarters. (Tr. 278:13-18.) Detective Rivera explained, "we have investigated

accidents like this . . . where a driver or operator[] has a large vehicle and a lot of times they really don't know that they actually hit someone – a pedestrian – and it is obvious. I mean, it is a large vehicle so we understand that." (Tr. 283:4-8.)

In his first statement, Mr. Clement told the Detective that "a car was coming very close to [his] truck on the left hand side." (Gov't Ex. 10.) Mr. Clement continued that when he was travelling through the narrowed portion of the roadway, he had slowed down to allow the silver minivan to his left to go first. (Tr. 279:23-280:1, 283:23-25.) Mr. Clement told them that he had seen a bicyclist up ahead, but his attention had been drawn away by the car to his left. (Tr. 280:10-15.) After speaking with Mr. Clement, Detective Rivera watched video footage for the first time. (Tr. 283:13-15, 19-25; 288:9-12.) In doing so, Detective Rivera learned that although the silver minivan was initially slightly ahead of the Postal Truck, the Postal Truck had gone first into the narrowed roadway, not the silver minivan. (Tr. 283:20, 284:15-22, 285:2; Pl's Ex. 1M.) As a result, weeks later on August 5, 2011, Detective Rivera showed the video to Mr. Clement, after which Mr. Clement gave a second statement. (Tr. 286:20-23; 288:16-289:23; Pl's Ex. 11.) In that statement, Mr. Clement indicated that his truck, not the silver minivan, went first. (Pl's Ex. 11.)

### ii.    New York Police Department Officer Scott Doerzbacher

Also later that afternoon, Officer Doerzbacher arrived at the scene. (Tr. 314:15-19.) The area was a "frozen zone," meaning it had been cordoned off by police tape or barriers to preserve the scene and prohibit the public from entering. (Tr. 314:15-315:6; Pl's Ex. 14Q.) Officer Doerzbacher is a member of the Highway Patrol unit that focuses on New York Vehicle and Traffic Law (the "VTL") violations, including any accidents with serious physical injuries or fatalities. (Tr. 306:23-307:8.) He is a certified accident investigator and is certified in Motor

Carrier Safety, which concerns safety regulations for large box trucks, trailers, and commercial vehicles. (Tr. 312:1-8.)

Officer Doerzbacher took measurements at the scene and drew the diagram in Plaintiff's Exhibit 13C. (Tr. 318:8-326:12; Pl's Ex. 13C.) He determined that there were no major defects in the roadway or any physical obstacles, other than the parked trailers, that would have contributed to an accident. (Tr. 317:13-19.) Mrs. Dershowitz's bicycle, still on the scene, was in a mid-range gear for normal peddling on a flat surface. (Tr. 331:19-20; Pl's Ex. 14Z.) Officer Doerzbacher also examined Mr. Clement's Postal Truck, but by the time he did so, there was no biological evidence on it. (Tr. 332:17-25; Pl's Exs. 14A-C.) He explained that, pursuant to the VTL, "the operator of a vehicle attempting to overtake a bicyclist has to be able to ensure there is enough room for the overtaking of the bicycle, to assure that when he would initiate his passing procedure, he can initiate, do the passing procedure and complete the passing procedure and then encroach back into the center portion of the roadway without causing any undue risk of accident or injury or harm to the bicycle operator." (Tr. 338:12-21.)

### iii.   Accident Reconstruction

Robert Genna, the director of the Suffolk County Crime Laboratory in Long Island, testified as the plaintiff's expert accident reconstructionist. (Tr. 466:17-21, 467:9-569:23, 470:23-471:3.) Mr. Genna explained that "[a]n accident reconstructionist is an individual who evaluates data from a motor vehicle accident and attempts to determine different factors, perhaps how and why the incident occurred, by studying the evidence if there is evidence, reviewing transcripts, witness statements, photographs, scene inspections, vehicle inspections, taking all of that material and reducing it down to an analysis." (Tr. 466:10-16.)

Mr. Genna testified that Mrs. Dershowitz was likely travelling parallel to the north curb when, at some point, she moved to her left to avoid striking the protruding Postal Trailer. (Tr. 634:10-12.) He opined that because "she was forced to move a little bit over to her left," the Postal Trailer "was a contributing factor as well." (Tr. 538:15-20, 540:1-5.) Meanwhile, as Mrs. Dershowitz proceeded forward, Mr. Clement was preoccupied "trying to position his vehicle adjacent to the [silver mini]van and was not paying full attention to the road ahead." (Tr. 534:10-18.) Based on video footage, Mr. Genna testified that Mrs. Dershowitz had been ahead of the Postal Truck from at least 11:59:39 a.m. until the moment of contact, estimated to be 13 seconds later. (Tr. 537:19-538:1.) At 11:59:49 a.m., two to three seconds before the impact, Mr. Clement's "attention was not [] focused on the road ahead" but "focused on the van," which meant that he "would not have been able to see Mrs. Dershowitz even though she was there to be seen." (Tr. 523:1-5.) Because the bicycle's metal scrape marks on the asphalt were consistent with a biker still riding as far to the right, or near the Postal Trailer, as possible, Mr. Genna reasoned that the Postal Truck must have "veer[ed] a little bit over to the right." (Tr. 531:15-20.) He concluded that Mr. Clement's driving "was a significant contributing factor" or "major cause" "as to why the incident occurred because his attention was [] distracted by jockeying with the [silver mini]van at the same time that he "was encroaching . . . onto Mrs. Dershowitz." (Tr. 522:14-19, 537:8-9.)

Mr. Genna took measurements to analyze, in greater detail, how the accident likely occurred. He testified that the handlebars of Mrs. Dershowitz's bicycle, based on other bicycles of the same type, were likely 41-42 inches high. (Tr. 516:15-20.) He also measured the Postal Trailer, which had been moved from the scene of the accident to a separate Postal Service facility. (Tr. 544:20-545:2.) At the facility, the bottom of the Postal Trailer was 46 inches off the

ground. (Id.) Because the roadway is lower than the sidewalk, Mr. Genna determined that the height from the roadway to the bottom portion of the Postal Trailer had been more than 46 inches. (Tr. 525:17-20, 526:5-10, 546:19-23; Pl's Exs. 13B, 13C.) As a result, he concluded that Mrs. Dershowitz's right handlebars had not come into contact with the Postal Trailer to her right because the handlebars would have been five to six inches below the bottom edge of the Trailer. (Id.) Mr. Genna could not say, however, whether the Postal Trailer's stilts had been adjusted from the day of the accident until the time that he measured them and therefore could not testify to a reasonable degree of certainty whether Mrs. Dershowitz's right handlebars made contact with the Postal Trailer.

Mr. Genna also measured the Postal Truck's right front wheel well, which is the metal portion of the truck that circumvents the wheel. The diameter of the front tire was three feet and four inches and the wheel well protruded one to two inches off the side of the vehicle. (Tr. 481:20-22; Pl's Ex. 12C.) The wheel well begins to circumvent the tire at two feet and two inches above the ground and continues to a height of four feet and eight inches at its apex. (Tr. 481:20-25, 482:8-10; Pl's Ex. 12C.) Based on the height of Mrs. Dershowitz's handlebars, Mr. Genna opined that Mrs. Dershowitz's initial contact with the Postal Truck occurred when her left handlebars came into contact with the Postal Truck's right wheel well. (Tr. 513:24-514:4.) Mrs. Dershowitz was facing westward, and Mr. Genna stated that her front tire had not been turning left because there was no evidence that the bicycle tire was struck by the Postal Truck. (Tr. 529:12-25.) He explained that the impact to the handlebars would have "pivot[ed] the front tire very quickly . . . stopping the forward motion of the cyclist and throwing her body and the cycle under and in-between" the Postal Truck's right tires. (Tr. 517:13-18:1, 534:10-25.) Mr. Genna explained that the fall would have been instantaneous: "There is no wobbling, no back

and forth. You're pivoting and you're going down. Period." (Tr. 530:20-24.) The Court finds Mr. Genna's testimony credible and scientifically supportable.

The night before he was scheduled to testify, the government decided not to call its own accident reconstructionist.

### iv.     Rosemary Jones

On July 13, 2011, eleven days after the accident, Officer Jones wrote a statement for the Postal Service Human Resources Department, at its request, about what she saw the day of the accident. (Tr. 79:7-80:11.) She testified that she took her time preparing her statement and was careful to portray accurately what she witnessed. (Tr. 80:9-81:25.) In her statement and at trial, Officer Jones indicated that from her position in Post 4, on the southern side of the street, she saw a woman riding her bicycle. She also saw three vehicles – the Postal Truck, a yellow taxi, and a third vehicle – "vying to be the first one down the street." (Tr. 86:23-87:2, 105:12-14; Pl's Ex. 7.) In her July 13, 2011 statement, she wrote that she "saw the Postal Truck veer to the right, and at the same time saw the [bicyclist] hit by the truck." (Tr. 89:13-14; Pl's Ex. 7.) The statement continued: "As the [Postal Truck] tried to straighten up and avoid hitting the [Postal Trailer on the north side of the Street], it bumped over what [she] believe[d] was the [bicyclist] or debris from the accident." (Tr. 90:13-15, 91:1-2; Pl's Ex. 7.) Upon questioning by the government at trial, Officer Jones explained that what she meant by "veer to the right" was that "[t]he postal truck was tilting to the right back down, it tilted. It did not move to the right. Bad wording I believe I put here, but it actually was tilting on the side and came back down." (Tr. 113:20-23.)

Officer Jones testified that the Postal Service Accident Investigation Board later asked her questions about her statement. (Tr. 107:25-108:5.) Because the Postal Truck had been

between Officer Jones and the bicyclist at the time of impact, a board member said to her, "well, you didn't actually see her hit by the truck." (Tr. 111:12-18.) As a result of that conversation, on July 20, 2011, Officer Jones amended her statement to read: "I saw the postal truck veer to the right and at the same time saw the [bicyclist] ~~hit by the truck~~." (Tr. 109:5-15, Gov't Ex. 10.) She did not change or revise the portion of the statement that she "saw the postal truck veer to the right." (Tr. 116:2-5, Gov't Ex. 10.) The Court finds Officer Jones's July 13, 2011 statement, written close in time to the accident and before it was revised, to be the most credible account of Officer Jones's experience that day. It does not credit her explanation at trial that she meant something different by "veer to the right."

### v.     Ahmed Benomar

The only witness to have a different narrative of the events surrounding the accident was taxi driver Mr. Benomar, a government witness. Mr. Benomar's testimony was contradicted by video footage, as well as other eyewitness accounts, and was not credible. The Court relied on no information that he supplied.

Mr. Benomar was born in Morocco, moved to the United States in 1982, and has been a cab driver for 23 years. (Tr. 626:21-24, 627:21-22.) His first language is French. In a deposition before trial, he spoke in English. (Tr. 637:16-638:5.) At trial, he used a French interpreter during direct examination but at times answered before the interpreter had translated and also answered in English. (Tr. 625:10-13, 627:17-20.) On cross-examination and re-cross, the plaintiff's attorney questioned him in English, and on re-direct, the government's lawyers did the same. (Tr. 637:16-674:4.) Although Mr. Benomar's comprehension of the English language did not require him to testify in English when he stated a preference for testifying in his native language,

he was plainly comfortable enough with English. The Court does not believe that there were language barriers or translations issues that would explain or justify his testimony.[2]

Mr. Benomar testified that on July 2, 2011, as his taxi proceeded westward on 29th Street between Ninth and Tenth Avenues, the traffic was back-to-back and crawling. (Tr. 645:6-21.) He testified that his taxi came to a complete stop for 2-3 minutes, and the Postal Truck came to a complete stop two to three times, as well. (Tr. 641:13-15, 645:6-21, 651:11-13, 652:16-22.) After passing Ninth Avenue, he saw two bicyclists riding side-by-side and moving faster than the traffic. (Tr. 631:22-632:2, 647:20-648:25.) Video footage, however, shows that this testimony is demonstrably false: traffic was moving continuously, at a moderate speed, and never stopped; and Mr. and Mrs. Dershowitz were never riding side-by-side, nor even one in front of the other, between Ninth and Tenth Avenues. (Pl's Ex. 1.)

On the day of the accident, Mr. Benomar left the scene as soon as Ms. Sunshine paid him. (Tr. 661:17-20.) Sometime later, he sent a letter to the Postal Service explaining what he saw "[s]o that the truck driver doesn't lose his job." (Tr. 636:15-25; Gov't Ex. 6.) He wrote, in English, that Mrs. Dershowitz had stopped her bicycle next to the Postal Trailer, waited patiently, then continued biking just as the Postal Truck passed, and that she was "dumb, irresponsible, and suicidal." (Id.) Mr. Benomar testified that he voluntarily sent this letter to the Postal Service because he did not want the driver to lose his job. (Tr. 636:21-25.) Given Mr.

---

[2] Although it is within the sole discretion of the Court to allow a witness to use an interpreter, a witness's use, or lack thereof, of an interpreter may bare on that witness's credibility. The Court of Appeals has held that a district court did not err in allowing a prosecuting witness to use an interpreter even though the witness spoke fluent English and even though the interpreter was used more in cross-examination than in direct. United States v. Frank, 494 F.2d 145, 145 (2d Cir. 1974). In so holding, however, the Court acknowledged, "we are disturbed by [the witness's] occasional resort to the interpreter when a cross-examiner seemed to approach at least a minor success." Id. at 157.

Benomar's unreliable memory and motivation in drafting his letter, the Court credits none of his testimony.

## II.     About Mrs. Dershowitz

Mrs. Dershowitz was born on February 27, 1943. She was 68.34 years old at the time of her death. (Tr. 349:2-4, 748:17-18.)

### A.     Mrs. Dershowitz Personally

#### 1.     Marriage, Home Life, and Health

Mr. Dershowitz met Mrs. Dershowitz at summer camp when he was 13 years old and she was 12. (Tr. 125:21-24.) Later, Mr. Dershowitz's brother married Mrs. Dershowitz's sister, and they came to know each other's families. The Dershowitzes started seriously dating when he was 19 years old and a student at Brooklyn College, and she was 18 and about to enter Barnard College. (Tr. 127:5-7.) They married on December 29, 1963. (Tr. 127:13.) On May 1, 1967, their son Adam Lee Dershowitz was born, and on May 5, 1970, their daughter Rana Dershowitz was born. (Tr. 130:10-12, 131:10-11.) The Dershowitzes' two nephews from their siblings' marriage were an intimate part of their immediate family and often around. (Tr. 135:13-22.)

Mr. Dershowitz testified that he was raised in a close-knit family, where relatives lived nearby and were always in and out of one another's homes and that the family celebrated occasions together. (Tr. 122:3-20.) That family life was important to him and Mrs. Dershowitz. As a married couple, the Dershowitz family home in Tudor City – where the Dershowitzes moved in 1986, and where Mr. and Mrs. Dershowitz lived until her death (Tr. 160:5-14.) – became the family focal point for their extended family. In addition to providing regular support and guidance to their nephews, the Dershowitzes, for example, took over hosting Thanksgiving dinner, for which Mrs. Dershowitz would cook for days, and which their immediate family, their

nephews, Mrs. Dershowitz's mother, and many extended family members and friends always attended.(Tr. 179:3-23.) After Mrs. Dershowitz died, their son Adam, his wife, and their two children moved into the Dershowitzes' apartment. Mr. Dershowitz moved two blocks away to be close to his son and grandchildren. (Tr. 178:13-16.)

Mrs. Dershowitz worked throughout her children's young lives, while also taking care of the household. She cooked meals, oversaw her children do their homework, took them on outings, spent time with them, and gathered the extended family for holidays. (Tr. 130:10-17, 131:14-16, 134:23-135:12.) While her daughter was in high school and her son about to go to college, around 1983, Mrs. Dershowitz "decided one day that she was going to go to law school." (Tr. 136:8.) She continued to cook and clean every evening and "stud[ied] well into the night until she would fall asleep with [] books on her." (Tr. 136:17-19.)

Mr. Dershowitz testified that in the years before Mrs. Dershowitz's death, she worked full time and was in "spectacular health." (Tr. 179:24.) In the mornings, she rode a stationary bike and read the newspaper. (Tr. 180:1-2.) She frequently biked to work. (Tr. 162:4-8, 173:6-8.) She worked long hours and often "fell asleep with briefs on her chest." (Tr. 158:3-5.) She played tennis, biked, hiked, and swam. (Tr. 157:22-158:2, 162:9-12, 180:2-8.) When visiting Rana in Colorado, she loved to ski. (Tr. 195:10-16.) Mrs. Dershowitz also spent time with her mother, who was healthy enough to play tennis until age 92 and was still alive, at age 97, at the time of the trial. (Tr. 128:21-22, 361:24-363:3.) "She bought virtually nothing for herself." (Tr. 183:8-184:19.) When she did spend money, it was for her children or grandchildren. (Tr. 184:3-7.)

### 2.    The Dershowitz Children

Adam Dershowitz was 44 years old when his mother died. (Tr. 129:10-12, 348:23.) He is an engineer and is married with two children. (Tr. 350:17, 357:16-20.) He received a Bachelor's

Degree, Master's Degree, and his Ph.D. from the Massachusetts Institute of Technology (MIT) School of Engineering, Department of Aeronautics and Astronautics. (Tr. 350:8-20.) He also was on MIT's ski team. (Tr. 353:10-14.) Following graduation, he worked at NASA. (Tr. 350:20-22.) Currently, he is a managing engineer at Exponent, a consulting firm, and is a registered professional engineer in numerous states. (Tr. 374:25-375:11.) He is a black belt in Aikido, certified in scuba diving, and an accomplished cook. (Tr. 375:18-376:2.)

Mrs. Dershowitz travelled to be with Adam and his wife upon each of his children's births. (Tr. 358:11-13.) At the time of his mother's death, Adam spoke with his mother weekly, if not daily, and "every time [he] had an important decision to make." (Tr. 182:19-24, 360:15, 368:9-13.) At trial, he recounted the story of his greatest professional disappointment: learning he had a non-fatal anatomical abnormality that prevented him from satisfying the final requirements of his life-long dream to become a NASA astronaut. (Tr. 355:7-356:14.) He turned to his mother to support him through it. (Tr. 356:14-23.) Adam continued to turn to Mrs. Dershowitz for professional guidance and advice, including on how to raise a teenage daughter. (Tr. 360:15-24.)

Rana Dershowitz was 41 years old when her mother died. (Tr. 558:10.) She lives in Colorado with her husband and two children, one of whom was born after Mrs. Dershowitz's death. (Tr. 555:25-556:8.) Rana was a student athlete who graduated from Harvard College and Harvard Law School. (Tr. 556:10-557:11.) After law school, she worked as an attorney for Fried, Frank, Harris, Shriver & Jacobson, LLP and Grubman, Indursky & Shire, PC, as the director of legal and business affairs and then vice-president at Madison Square Garden, and as deputy general counsel for the U.S. Olympic Committee. (Tr. 556:15-557:11.) Currently, she is the general counsel to the Aspen Skiing Company. (Tr. 564:1-3.)

Rana testified how she needed her mother's guidance most when she became a mother: "I am part of a generation of women professionals [], many of whom like me didn't have kids until later in life. [I]n many ways, yes, I am an adult, I am capable [of] taking care of myself. . . . [but] parenting is part of that growing-up process. . . . [Y]ou do feel like an adult in a lot of different ways, but you're no different than the 20-year old who is having their first kid or the 18 year-old . . . or the 30-year-old. . . . [B]ringing the next generation into the world . . . was where I turned to my mom most." (Tr. 564:11-565:2.) Rana recounted, "I really struggled to figure out how I could balance being the mom that I wanted to be, and that really was the mom that [my mother] had been, and have the career that I wanted to have." (Tr. 559:6-9.) Her mother was the best guide: she talked Rana through her professional struggles and helped with Rana's son's night terrors and child rearing generally, while also modeling for Rana how to juggle both. (Tr. 558:23-24, 559:17-20, 560:10-18, 562:16-24.)

Mr. Dershowitz testified that as his children grew older, "I don't think my children made any major, significant decisions without discussing them with Marilyn. . . . Whether it was decisions about the children, decisions about professions, decisions about everything. . . ." (Tr. 182:15-20.)

### B.    Mrs. Dershowitz Professionally

#### 1.    Work History

After Mrs. Dershowitz graduated from Barnard College, she worked until her son Adam was born. (Tr. 127:5-7, 129:21-22.) Following his birth, she went back to school at New York University and got a vocational counselor degree. (Tr. 131:24.) She then worked at various social services organizations, including a methadone clinic and the New York Organization for New

Americans. (Tr. 132:11-18.) At the latter, she worked with refugees from the Soviet Union and Cambodia to help them integrate into American society. (Id.)

At age 42, she went to law school. (Tr. 133:1-4.) At the time, Adam had started college and Rana was in high school. Upon graduating, she briefly worked for her husband's firm. (Tr. 136:23-24.) She was then hired by State Supreme Court Justice Lewis Friedman as his principal law secretary. (Tr. 137:7, 18.) Described as his "partner," Mrs. Dershowitz brought "a couple of hours' worth of work" home every night. (Tr. 138:9-15, 225:4-7.) On Fridays, Mrs. Dershowitz and Justice Friedman would divide up the court's motions, split the piles and each take one home, write draft decisions on the motions over the weekend, switch the piles and review each other's opinions on Monday, and issue the opinions by Thursday, before beginning all over again. (Tr. 137:21-139:4.) She worked in that position for twelve years, until December 1994. (Tr. 143:11-15, 228:11-16.)

She then became a Special Referee at the State Supreme Court, a position that she held for the next eleven years until the end of 2010. (Tr. 139:2, 143:15, 150:5-10.) Her salary was $127,438.96 when she left. (Tr. 192:17.) As a Special Referee, she was "not a Judge with all the full regalia of a Judge," but she had "the power to hear issues in a matrimonial case . . . hear all the witnesses, take in all the briefs, hear all the arguments, hear all the testimony, and then write" a public, binding decision. (Tr. 230:24-231:4, 232:3-7.) She had no staff, secretary, or law clerk but typed, researched, and wrote everything herself. (Tr. 204:5-12.) Matrimonial lawyer Harriet Cohen, a friend and colleague of Mrs. Dershowitz for forty years, described Mrs. Dershowitz as "a very, very hard worker. She enjoyed what she was doing. That was very obvious from my observations of her. She was the first one in in the morning and the last one out at night." (Tr. 232:10-16.) Mr. Dershowitz testified that, in addition to the cases that were automatically

assigned to Mrs. Dershowitz, "an arrangement was made with the approval of" Chief

Administrative Judge Jackie Silberman, "that if the two parties agreed," they could send their

case to Mrs. Dershowitz by consent: the arrangement "was primarily pushed by the people who

were practicing matrimonial law because they knew Marilyn [] had experience." (Tr. 141:8-19.)

During her time as a Special Referee, she lectured at continuing legal education ("CLE") courses

and for the State and City bar associations, where she served on numerous committees.

(Tr. 144:19-24, 229:24-230:1.)

   Mrs. Cohen explained that Mrs. Dershowitz was a "very, very skilled" referee because

"[s]he had great intelligence, great training, tremendous education . . . tremendous stamina[,] and

was indefatigable." (Tr. 226:3-4, 231:12-14, 271:16-24.) "Whatever her determination was going

to be, for you or against you, [Mrs. Cohen] knew it was going to be on the law and the facts and

it was going to be fair." (Tr. 231:23-25.) Describing Mrs. Dershowitz's specific mediation skills

and "diplomacy," Mrs. Cohen explained how Mrs. Dershowitz listened, and "[s]he would talk

either separately or together to us. She would express what were weaknesses in one case, what

was the strength in one case. She would see issues that were there – that need[ed] to be resolved

perhaps in money situations by splitting some differences. She could see that some issues that

were causing great agitation were really not big issues at all." (Tr. 227:17-228:3.) She was

someone who could "make each of the attorneys give u[p] a little bit of what they think [they]

wanted] to achieve." (Tr. 228:4-8.) Mr. Dershowitz also testified that Mrs. Dershowitz was a

very skilled mediator: she was a "psych and art history major in college[,] so she used her

psychology knowledge, her vocational counseling knowledge, [] her legal knowledge, and there

was a confluence of knowledge that made her so good at what she was doing." (Tr. 158:20-24.)

Mrs. Dershowitz retired from her work as a Special Referee when the State Supreme Court offered certain senior employees buyouts as a cost savings measure. (Tr. 145:20-146:13.) The State Court system offered Mrs. Dershowitz either (1) a monthly sum for the duration of her lifetime, or (2) a lesser monthly sum for the duration of her lifetime, but if she passed away, an amount still to be paid to her surviving spouse. (Tr. 146:24-147:8.) After consulting with at least her son and husband, Mrs. Dershowitz chose the first option. Mr. Dershowitz explained: "recognizing that Marilyn's mother was in her 90s, her father had lived well into his late 80s and Marilyn was in excellent health, the decision was made that it was economically more reasonable to take the top dollar amount for the rest of her life on the expectation that she will live at least as long as her mother does." (Tr. 147:12-17, 365:1-15.)

In February of 2011, Mrs. Dershowitz began to volunteer as a mediator at the Appellate Division of the New York State Court. (Tr. 151:19-22.) Mr. Dershowitz testified that Justice Gische "convinced or suggested to Marilyn that [she] become a mediator in the appellate division as a transition to her setting up her own practice." (Tr. 151:17-19, 200:11-16.) He continued that, "Marilyn loved what she did . . . [and she] was incapable of [] sitting around. This was an opportunity. And she also thought it would be very valuable for her for purposes of getting clients. . . . [It] was a specific nice thing to have on [her] resume. . . . [I]t opened her up to meeting and dealing with mediation in a slightly different context, that's on the appellate level," and opened her to cases for which she would serve only as a mediator "without the threat of or the power to decide a case." (Tr. 200:11-201:21.) Mrs. Cohen also testified that Mrs. Dershowitz's volunteer work at the Appellate Division was a temporary position that was valuable to starting her business. (Tr. 243:16-20.) Mrs. Dershowitz continued to network, "did a lot of meeting and greeting," stayed active in bar associations, read the New York Law Journal

daily, and attended CLE programs. (Tr. 155:7-17, 245:7-15, 572:1-573:3.) Until the time of her

death, her work ethic "never let up." (Tr. 157:19-20, 243:25, 573:15-16.)

### 2. Future Private Mediation Practice

#### i. Mrs. Dershowitz's Plans

Mr. Dershowitz, Rana, Adam, and Mrs. Cohen all testified that Mrs. Dershowitz accepted

the retirement buyout from the State Supreme Court but did not plan to stop working. (Tr. 151:5-

6, 236:20, 366:1, 23.) Mr. Dershowitz testified that "one of the [] reasons why she accepted the

buyout was because she wanted to set up a mediation practice on her own. . . . [T]here was just

not a chance in the world that she was going to sit down and do nothing." (Tr. 150:18-20, 152:4-

6.) He continued, "There is just no doubt. I mean, there was just simply no doubt that that's what

she was going to do." (Tr. 156:16-17.) "[W]e talked about it. That was her intent. She said

so. . . . She never would have accepted the buyout . . . if it meant sitting on a couch. . . . It meant

that it gave her a base for her to do what she really wanted to do, and she wanted that flexibility.

Flexibility was very important. But she also wanted to work." (Tr. 204:23-205:5.)

Rana testified, "she never would have retired, and she talked to me about how she even

felt uncomfortable it was called retiring from the court because that is not who she was, and she

so defined herself by [her work]. She was moving into the next phase of what she was going to

do." (Tr. 571:18-22.) Mrs. Cohen testified that over a lunch at the end of 2010, Mrs. Dershowitz

told her that "she had just accepted a package from New York State Supreme Court and . . . was

going to have a second career." (Tr. 233:5-9.) In accepting the buyout, Mrs. Dershowitz wanted

flexibility to spend time with her aging mother, her children, and her grandchildren. (Tr. 194:7-

12, 573:7.) She wanted the flexibility to take long weekends in Colorado. (Tr. 573:9-10.)

Mr. Dershowitz testified that Mrs. Dershowitz planned to start her own private mediation practice in September 2011. (Tr. 156:13-15.) They had not made vacation plans for September, October, November, or December to allow her to do so. (Tr. 156:13-15, 202:18-25.) Mrs. Cohen also testified that Mrs. Dershowitz planned to start her business after the summer. (Tr. 243:6-7.) The Dershowitzes had discussed that "the advantage of mediation [], aside from the actual sessions where she had to be with the parties," was that "preparation work" and "writing the decisions . . . could be done anywhere." (Tr. 203:10-14.) This work would be "much more flexible, and that was the critical element." (Tr. 203:25-204:1.) Mr. Dershowitz testified that Mrs. Dershowitz wanted to work 20-25 hours a week, but "[k]nowing Marilyn, I am not sure she would have stuck to that." (Tr. 156:16-20, 195: 24-25.) Mrs. Cohen testified that for Mrs. Dershowitz, "part time" likely meant that she might work for ten days but then take five days off where she would not be available at all. (Tr. 272:6-16.)

In terms of *how* she would set up her business, Mr. Dershowitz testified that Mrs. Dershowitz considered a few options: (1) accepting a position with a law firm that does matrimonial mediation work; (2) doing mediation through a mediation provider, such as the Judicial Arbitration and Mediation Services ("JAMS"); or (3) working on her own. (Tr. 152:11-153:7, 366:23-367:6.)

Mrs. Dershowitz was offered and rejected the first option. Mrs. Cohen testified that she had just founded a new law firm and wanted Mrs. Dershowitz to join. (Tr. 236:1-20.) She thought Mrs. Dershowitz would be an asset to her firm because she "was extremely well known in the field [of matrimonial law]," and "was revered and respected," and thought that it would "be a great marketing thing." (Tr. 236:5-9.) She offered Mrs. Dershowitz a yearly salary of $225,000. (Tr. 152:18, 196:20, 258:15-21.) Mr. Dershowitz explained that Mrs. Dershowitz

rejected the offer because "it was a litigation [position], and that's what she didn't want to do." (Tr. 196:15-19.) Mrs. Dershowitz also did not want to work fulltime and wanted the flexibility to choose her own hours. (Tr. 258:22-259:11.) Mrs. Cohen explained, "it is not that she was going to slow down, it was that she was going to tailor her work around her life." (Tr. 244:13-25.)

Mrs. Dershowitz also rejected the second option of working through an intermediary such as JAMS. (Tr. 196:6-12.) Accustomed to working without administrative support, she did not want to pay a percentage of her income to an organization for support services she did not need. (Tr. 204:12-16.)

Mr. Dershowitz testified that Mrs. Dershowitz planned to pursue the third option: establishing a solo mediation practice. Mrs. Cohen testified that her firm would rent an office to an independent practitioner for approximately $1,800 per month. (Tr. 246:1-3.) Mr. Dershowitz and Mrs. Cohen both testified, however, that Mrs. Dershowitz had decided not to rent an office from a law firm. She did not want to be associated with a firm and lose the business of the firm's competitors. (Tr. 153:5-7, 236:15-25.) Instead, Mrs. Dershowitz was considering working out of their apartment, using Mr. Dershowitz's home office, and renting space by the hour for mediation sessions. (Tr. 153:10-25, 206:6-14, 367:1-3.)

At the time of her death, Mrs. Dershowitz had not entered into any contracts to open a private mediation practice. (Tr. 197:21-22.) She had not leased office space, had no clients, had not formed a legal entity or registered a business name, had not taken out liability insurance (assuming any was required), or drafted a business plan. (Tr. 198:5, 263:24-264:16.)

### ii.       Mrs. Dershowitz's Future Earnings

At the time of her death, Mrs. Dershowitz was 68.34 years old with a statistical life expectancy of 17.43 additional years. (Tr. 415:7-8.) Mr. Dershowitz was 69.16 years old with a statistical life expectancy of 14.49 additional years. (Tr. 441:22-25.)

### a.       Testimony on Mrs. Dershowitz's Hourly Rate

Based on the rate "organizations charged when [he] took cases to mediation," Mr. Dershowitz testified that he thought the going hourly rate for a private mediator would be between $400 to $800 or $900 an hour. (Tr. 205:16-21.) When Mrs. Dershowitz accepted the buyout, "she knew friends who were working as mediators working significantly less hours and making significantly more. . . . They were getting paid $450 an hour. Some of the judges were making $600, $650 an hour." (Tr. 156:23-157:8.)

Mrs. Cohen testified that Mrs. Dershowitz would make "[n]o less than $600 an hour" as a solo practitioner. (Tr. 242:20.) A rate of "$450 an hour would be for a less luminary of a mediator." (Tr. 242:10-13.) Mrs. Cohen based this on the rates of other practitioners she knows and on Mrs. Dershowitz's experience. She discussed former judges who had become mediators and were still practicing in their late 70s and 80s. (Tr. 240:18-241:10, 762:1-18.) For example, she testified that Betty Ellerin provided mediation services through her firm, Alston & Bird, LLP, as well as JAMS, and charged $800 per hour in 2013. (Tr. 273:5-7, 241:16-21.) She believed Saralee Evans charged $600 per hour. (Tr. 242:5.) In addition to hiring mediators through organizations such as JAMS, Mrs. Cohen testified about litigators who also provide mediation services through their law firms. She noted by way of example William Zabel, a founding partner at Schulte Roth & Zabel LLP. (Tr. 241:5-10.) She testified that "[t]here is a need for good mediators . . . [and] there was room for Marilyn Dershowitz." (Tr. 241:13-15.)

There was no testimony or evidence concerning the billing rates for solo practitioners, the demand for services from solo practitioners, or the size of the private mediation bar.

### b.        Economic Expert Testimony

The analysis of overall economic loss was offered through the testimony of economic experts: Dr. Gary M. Crakes for the plaintiff, and Dr. Leonard Freifelder for the government. In reaching their conclusions, both experts relied on deposition testimony concerning the likely range of hourly rates that Mrs. Dershowitz could demand, with plaintiff's expert considering economic losses based on both a $450 hourly rate and $600 hourly rate, while the government's expert assumed only a $600 hourly rate. Neither expert independently determined the appropriate hourly rate for a private mediator, or conducted any empirical analysis of start-up and operating costs of a private mediation practice or percentage rates of billed and collected hours. (Tr. 457:25-459:1, 735:2-15.) Both experts reviewed Mrs. Dershowitz's earnings record for approximately three to four years, information concerning her date of birth and death, her pension benefits, social security benefits, deposition transcripts from Mr. Dershowitz and Mrs. Cohen, as well as various governmental and statistical publications. (Tr. 408:9-20, 729:20-730:10.)

### 1)        Dr. Crakes[3]

The plaintiff's expert, Dr. Crakes, testified first and made the following assumptions. Mrs. Dershowitz's life expectancy at the time of her death was an additional 17.43 years, or to the age of 85.77 years. (Tr. 415:7-8, 423:22-25.) He explained that life expectancy is a statistical

---

[3] Dr. Crakes received an undergraduate degree in economics from Central Connecticut State College in 1975, and a Master's Degree and Ph.D. in economics from the University of Connecticut in 1976 and 1984, respectively. He has taught a variety of courses, including economics, public finance, and economic statistics at the University of Connecticut and Southern Connecticut State University, where he is now a professor emeritus. He has published approximately 22 articles in different areas of economics and has conducted appraisals of economic loss since 1981. (Tr. 403:16-407:18.)

average calculated by the federal government's National Center for Health Statistics and takes into account age, gender, and race. (Tr. 409:4-7.) In contrast, work-life expectancy is "the period of time used for the purposes of estimating the earning capacity that an individual would have had available to them absent their death or injury." (Tr. 408:24-409:2.) Calculated by the Journal of Forensic Economics and Journal of Legal Economics, it does not take into account the health or specific occupation of a particular individual but does take into account educational attainment. (Tr. 409:8-11, 416:12-18, 417:4-9.) Based on her work-life expectancy, Mrs. Dershowitz could be expected to work to age 75. (Tr. 415:19-24.) Because of Mrs. Dershowitz's work ethic and interest in her work, Dr. Crakes also ran analyses based on her working until age 78. (Tr. 415:19-416:7; Pl's Exs. 21, 21A-E.)

Dr. Crakes began Mrs. Dershowitz's earning calculations as of January 1, 2012. (Tr. 417:20-418:11.) Dr. Crakes assumed she would work a part-time schedule of 22 billable hours per week, or 1,100 billable hours in a 50-week year. (Tr. 419:1-2.) She would earn either $450 hourly (or $495,000 annually) or $600 hourly (or $660,000 annually). (Tr. 418:17-19, 420:13-16.) He bifurcated her earnings into two categories: past earnings (January 1, 2012 to February 5, 2015, the date of his testimony) and future earnings (after February 5, 2015 until she attained age 75 and 78). (Pls. Exs. 21B-21E.) He assigned her earnings a growth rate of 2%, which he considered conservative and deducted 10% of her earnings for business expenses (as an average, though admittedly without any actual analysis or information to rely upon). (Tr. 419:19-420:4, 421:2-4.)

Dr. Crakes also calculated Mrs. Dershowitz's pension and social security benefits based on the assumption that they would continue to her life expectancy. (Tr. 423:22-424:13.) The undiscounted value of her past and future pension benefit for 17.43 years was $1,653,469.

(Tr. 424:7-13.) Mrs. Dershowitz received $1,822 a month in social security, and the undiscounted value of her past and future social security benefit for 17.43 years was $458,101. (Tr. 424:14-23.)

Dr. Crakes then deducted a value for personal maintenance from all her income – earnings from her mediation practice, pension and social security benefits. Based on the U.S. Department of Labor's Consumer Expenditures publication, personal maintenance is a statistical average based upon the decedent's share of household expenses for things such as housing, food, clothing, entertainment, services, transportation, and medical care. (Tr. 425:13-24, 726:3-9.) Dr. Crakes and Dr. Freifelder, the government's expert, used the same personal maintenance rate of 20%. (Tr. 426:12-20, 727:12-14.) Dr. Crakes, however, deducted that rate through till Mrs. Dershowitz life expectancy, or for 17.43 years from her death; whereas Dr. Freifelder assumed that the rate would rise to 100% – that is, personal maintenance would consume all of Mrs. Dershowitz's income – at the time of Mr. Dershowitz's death, estimated at 14.49 years from Mrs. Dershowitz's death.

Finally, Dr. Crakes sought to value the household services performed by Mrs. Dershowitz, which would be added to the total pecuniary loss. The value of household services is "the economic value of the capacity to perform services in and about the home," and it is an average based on the U.S. Bureau of Labor Statistics' American Time Use Survey. (Tr. 427:12-18.) Because of Mrs. Dershowitz's occupation, Dr. Crakes assumed that she would perform fewer household services than the average female in her grouping. Therefore, he calculated her lost value of household services at 50% of the Survey's valuation, or at $120,922 for the duration of her life expectancy. (Tr. 427:19-25, 443:15-16; Pl's Ex. 21.)

Dr. Crakes then calculated past and future earnings, based on a $450 and $600 hourly rate and working to age 75 and 78. Based on a $450 hourly rate, Mrs. Dershowitz's total net undiscounted economic loss would have been $4,050,752 working to age 75, and $5,233,027 working to age 78. (Tr. 428:6-11; Pl's Exs. 21, 21B, 21C.) At $600 per hour, her total net undiscounted economic loss would have been $4,797,609 working to age 75, and $6,373,976 working to age 78. (Tr. 430:18-22; Pl's Exs. 21, 21A, 21D, 21E.)

### 2)      Dr. Freifelder[4]

The government's economic expert Dr. Leonard Freifelder explained that in conducting his analyses, he was trying to capture the "pecuniary loss of financial support[, or] the difference between the economic income Mrs. Dershowitz would have brought into the household from various sources less her own personal consumption costs." (Tr. 725:20-25.)

Dr. Freifelder's analyses differed from Dr. Crakes's in several significant ways. First, he assumed that when Mrs. Dershowitz worked a part-time schedule of 22 hours per week, or 1,100 a year, only 600 of those hours would be billable (whereas Dr. Crakes assumed all 22 hours would be billed and collected). (Tr. 732:18-23.) The non-billable hours would be time spent on the telephone to potential clients, marketing, billing, non-billable client communications, and networking. (Tr. 733:15-19.) He also ran calculations only at a $600 hourly rate (and not $450). (Tr. 731:20-21.) He assumed she would have $60,000 of business expenses (as opposed to Dr. Crakes, who assumed 10% of earnings in business expenses). (Tr. 802:1-4.) He acknowledged on cross examination, however, that this figure was based on an assumed $5,000 per month

---

[4] Dr. Freifelder received an undergraduate degree from the Wharton School of Business, with a major in actuarial science, and a Master's Degree and Ph.D. from the University of Pennsylvania, with a major in operations research and statistics. He has worked as a professor at Temple University, the University of Connecticut, and Baruch College. He is an associate of the Society of Actuaries, which requires a series of five examinations, and a member of the National Association of Forensic Economics. He has been self-employed as a forensic analyst for the past 18 years. (Tr. 719:1-723:6.)

expense not grounded in any analysis of actual likely business expenses. Dr. Freifelder concluded that Mrs. Dershowitz's gross revenue would be $360,000 a year minus $60,000 for business expenses, or $300,000 in net income. (Tr. 731:20-732:3.) From that number, he then deducted her personal consumption. (Tr. 732:13-15.)

Second, Dr. Freifelder calculated Mrs. Dershowitz's lost earnings until ages 75 and 80 (as compared to 75 and 78, as Dr. Crakes performed). (Tr. 735:21-23.) Age 75 was based on Mrs. Dershowitz's statistical work-life expectancy, or the average period of time that a woman of her age and education would be expected to work. (Tr. 735:25-736:17.) This number was based on The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors from the Journal of Forensic Economics, August 2011. (Tr. 736:12-20.) Age 80 was based on Mrs. Dershowitz's healthy-life expectancy, which measures the expected number of years an individual of a given age, race, and sex is expected to be healthy enough to do basic activities of normal living. (Tr. 737:6-25, 797:10-14.) Mrs. Dershowitz's healthy-life expectancy is 80.89 years old, and Dr. Freifelder rounded down to age 80. (Tr. 737:2-3, 765:17-25.) Healthy-life expectancy numbers were based on the Healthy Life Expectancy 2009 Tables published by Expectancy Data. (Tr. 737:12-14.)

Third, Dr. Freifelder used higher growth rates than Dr. Crakes. (Tr. 795:17-20.) He assumed a growth rate for earnings of 3.47% (not 2%, as used by Dr. Crakes). (Tr. 780:3-7.) That higher rate was the average increase in the cost of legal services over the ten year period 2003 through 2013 based on the Consumer Price Index. (Tr. 793:22-794:3.) He used a 2.49% growth rate for social security retirement benefits based on the average increase of the social security cost of living index over the ten years 2004 through 2014. (Tr. 794:17-20.) And he assumed a flat cost of living increase in her pension of $214.85 per year, starting five years after

Mrs. Dershowitz retired from the state court system. (Tr. 794:24-795:2.) Finally, he used a

2.15% growth rate for household services, which was the increase in wages and salaries of

private industry workers in service jobs over the last ten years. (Tr. 794:21-23.)

Fourth, Dr. Freifelder used Mr. Dershowitz's life expectancy and Mrs. Dershowitz's

healthy-life expectancy as the cutoff for certain non-earnings economic loss calculations,

whereas Dr. Crakes used only Mrs. Dershowitz's life expectancy. (Tr. 728:10-15.) He calculated

household services as beginning on the date of Mrs. Dershowitz's death and running to her

healthy-life expectancy, when it is expected that she could no longer perform activities of normal

living. (Tr. 742:1-7, 747:14-18, 749:21-750:21.) Using the Dollar Value A Day Study, he

estimated that Mrs. Dershowitz would spend 25 hours per week on household chores when

working, and 28 hours after retiring, until her healthy-life expectancy. (Tr. 740:8-17.) In total,

the value of her household services was $208,261 assuming a work life to age 75, and $198,001

assuming a work life to age 80. (Tr. 750:17-21; Gov't Ex. 27.)

Like Dr. Crakes, Dr. Freifelder started Mrs. Dershowitz's lost retirement and social

security benefits on the date of her death. (Tr. 747:15-18.) But Dr. Freifelder calculated those

benefits to end at Mr. Dershowitz's life expectancy, when he predicted that Mrs. Dershowitz's

income would be entirely consumed by household expenses. Thus, although Dr. Freifelder used

the same personal maintenance rate of 20% initially, he explained that personal consumption

costs do not include shared household expenses, such as a mortgage or utility bill. (Tr. 726:3-23.)

As a result, when a two-member household becomes a one-member household, "almost all of the

expenses of the household [] become personal consumption." (Tr. 727:3-8.) Thus, "if Mr.

Dershowitz died before his wife, his wife would then be a household of size 1 and the personal

consumption – the costs, the items that are considered to be personal consumption would now

include items that normally would have, while he was alive, have been shared economic goods."
(Tr. 755:8-13.) For this reason, Dr. Freifelder concluded that after Mr. Dershowitz's death, Mrs.
Dershowitz's personal consumption rate would be 100%; that is, all of her pension and social
security benefits would be spent for household consumption. (Tr. 755:13-18.) Dr. Freifelder,
however, acknowledged that he did not have any information regarding the Dershowitzes'
household expenses or the family finances, which would be "relevant" to this assumption.
(Tr. 756:3.) Using a cutoff of Mr. Dershowitz's life expectancy of 14.49 years from the date of
Mrs. Dershowitz's death, the undiscounted total value of Mrs. Dershowitz's past and future
pension benefit was $1,894,311. (Gov't Ex. 27.) The undiscounted total value of her past and
future social security benefit was $553,232. (Id.)

In sum, Dr. Freifelder concluded that Mrs. Dershowitz's net undiscounted economic loss
would have been $3,209,452 working to age 75, and $4,786,209 working to age 80. (Id.) Dr.
Freifelder repeatedly acknowledged that his calculations *assume* that Mrs. Dershowitz was able
to open a mediation practice and that she could demand $600 an hour for her services.

## CONCLUSIONS OF LAW

### I.      The Federal Torts Claim Act

Under the FTCA, a person may bring a claim against the United States for "personal
injury or death caused by the negligent or wrongful act or omission of any employee of the
government while acting within the scope of his office or employment, under circumstances
where the United States, if a private person, would be liable to the claimant in accordance with
the law of the place where the act or omission occurred," or in this case, the law of New York
State. 28 U.S.C. § 1346(b); Millbrook v. United States, 133 S. Ct. 1441, 1444 (2013); Liranzo v.
United States, 690 F.3d 78, 85 (2d Cir. 2012).

## II.        Wrongful Death and Negligence

"[A] wrongful death action belongs to the decedent's distributees and is designed to

compensate the distributees themselves for their pecuniary losses as a result of the wrongful act."

Heslin v. Cnty. of Greene, 14 N.Y.3d 67, 76 (2010) (citing N.Y. EPTL § 5-4.3). Under New

York law, to establish a claim for wrongful death, "[t]he personal representative . . . of a

decedent who is survived by distributees" must establish the "wrongful act, neglect or default

which caused the decedent's death against a person who would have been liable to the decedent

by reason of such wrongful conduct if death had not ensued." N.Y. EPTL § 5-4.1. See Garcia v.

Dutchess Cnty., 43 F. Supp. 3d 281, 298-99 (S.D.N.Y. 2014) (quoting Hollman v. Taser Int'l

Inc., 928 F. Supp. 2d 657, 683 (E.D.N.Y. 2013)). A plaintiff may demonstrate causation by

showing that a defendant's acts or omissions were negligent.

"Negligence . . . is a failure to use that degree of care that a reasonably prudent person

would have used under the same circumstances; negligence may arise from doing an act that a

reasonably prudent person would not have done under the same circumstances, or from failing to

do an act that a reasonably prudent person would have done under the same circumstances."

Silva v. United States, 08 Civ. 4114 (JBW), 2010 WL 3731172, at *4 (E.D.N.Y. Sept. 20, 2010)

(citing New York Pattern Jury Instructions 3d ed. 2:10 et seq. (2010) ("NYPJI")). Under New

York law, to establish a claim of negligence, the plaintiff must demonstrate (1) that the defendant

owed the decedent a duty of reasonable care, (2) a breach of that duty, and (3) an injury

substantially caused by the breach. See Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209,

215 (2d Cir. 2002); Elmaliach v. Bank of China Ltd., 971 N.Y.S.2d 504, at *5 (1st Dep't 2013).

"The mere happening of the accident does not establish liability on the part of the defendant."

Lewis v. Metro. Transp. Auth., 472 N.Y.S.2d 368, 372 (1st Dep't 1984). Rather, the plaintiff

bears the burden of proving by a preponderance of the evidence that the injuries in question were proximately and substantially caused by the defendant's negligence. See, e.g., Caraballo v. United States, 830 F.2d 19, 22-23 (2d Cir. 1987) (holding that an adult swimmer's decision to dive head first into three feet of water was an unforeseeable superseding cause of his injuries, barring liability of the United States for its failure to post signs or adequately patrol the area). Proximate cause is that "which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." Id. at 22 (citation omitted).

In a wrongful death action based on negligence, the plaintiff "is not held to as high a degree of proof as is required in a case where the injured person may take the stand and give their version of the occurrence." Maura v. ACL Leasing, LLC, 12 Civ. 8909 (RWS), 2014 WL 7250952, at *3 (S.D.N.Y. Dec. 19, 2014) (citing Noseworthy v. City of New York, 298 N.Y. 76, 78 (1948)). "The plaintiff's evidence is deemed sufficient to make out a *prima facie* case if it shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred." Maura, 2014 WL 7250952, at *3 (quoting In re Lattimore's Estate, 316 N.Y.S.2d 363, 364-65 (4th Dep't 1970)).

## III.    Liability

The plaintiff raises three theories of the defendant's alleged breach of a duty of care: (1) Mr. Clement drove negligently in violation of VTL § 1146(a), which requires that drivers "exercise due care to avoid colliding with any bicyclist," and VTL § 1122-a, which requires a vehicle overtaking a bicycle to "pass to the left of such bicycle at a safe distance until safely clear thereof"; (2) Mr. Clement drove negligently in violation of New York common law because he failed to see what was ahead of him; and (3) the Postal Service negligently parked the Postal Trailer causing the dangerous road conditions that led to Mrs. Dershowitz's death. The

plaintiff seeks $8,987.632.15 in damages. In turn, the government argues that Mrs. Dershowitz's own actions were the sole proximate cause of the accident, or alternatively, that her actions were a substantial contributing cause of the accident. The government further argues that if found liable, lost earnings damages are too speculative to be awarded.

The Court finds that the plaintiff has established by a preponderance of the credible evidence that the government's negligence – both Mr. Clement's driving and the Postal Trailer's placement – was the sole, proximate cause of the decedent's injuries. Mrs. Dershowitz was not contributorily negligent.

## A.     Mr. Clement's Negligence

As set out by the VTL, New York common law, and New York City law, Mr. Clement owed Mrs. Dershowitz – a biker sharing the roadway – a duty of reasonable care. He breached that duty, contributing to the accident that took Mrs. Dershowitz's life.

### 1.     New York State Vehicle and Traffic Laws

The Postal Service, its drivers, and bicyclists are subject to the provisions of VTL Title II. See VTL §§ 1103(a), 1231. A violation of a standard of care imposed by the VTL constitutes negligence *per se*. Michael Dalton as Adm'r of the Estate of Aileen McKay-Dalton v. United States, 12 Civ. 506 (NGG)(JO), 2014 WL 7423760, at *21 (E.D.N.Y. Dec. 31, 2014). See, e.g., Gray v. Wackenhut Servs., Inc., 721 F. Supp. 2d 282, 290 (S.D.N.Y. 2010); Delgado v. Martinez Family Auto, 979 N.Y.S.2d 277, 279 (1st Dep't 2014); Barbieri v. Vokoun, 900 N.Y.S.2d 315, 318 (2d Dep't 2010). If one party establishes *prima facie* a violation of the traffic law, the burden shifts to the other party to produce evidence showing that there was no violation or offering a sufficiently reasonable explanation or excuse for the violation. See Delgado, 979 N.Y.S.2d at 279.

VTL Section 1146(a) provides that, "[n]otwithstanding the provisions of any other law to the contrary, every driver of a vehicle shall exercise *due care* to avoid colliding with any bicyclist . . . upon any roadway and shall give warning by sounding the horn when necessary." VTL § 1146(a) (emphasis supplied). "Due care is that care which is exercised by reasonably prudent drivers." Kane v. United States, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002) (quoting Russell v. Adduci, 528 N.Y.S.2d 232, 234 (3d Dep't 1988)). Section 1146(a) places the burden on the driver to avoid bicyclists. If a driver "causes serious physical injury while failing to exercise due care . . . there shall be a rebuttable presumption that, as a result of such failure to exercise due care, such person operated the motor vehicle in a manner that caused such serious physical injury." VTL § 1146(c)(2). See also N.Y.P.L. § 10.00(10) (defining "serious physical injury" in part as "physical injury . . . which causes death").

Here, as set forth in the Court's Findings of Facts, the preponderance of credible evidence introduced at trial demonstrates that Mr. Clement violated VTL § 1146(a) as he did not exercise due care to avoid colliding with Mrs. Dershowitz. For fourteen seconds after passing Ninth Avenue, Mrs. Dershowitz was ahead of the Postal Truck. In Mr. Clement's deposition, he testified that he never saw a bicyclist. Mrs. Dershowitz was there to be seen, however, and a reasonably prudent driver would have seen her. Instead of navigating his truck around her, Mr. Clement was vying to be the first vehicle to enter the narrowed portion of the roadway, and his attention was on the minivan to his left. Multiple witnesses testified that as the cars merged into one lane, the Postal Truck moved right. The government has not rebutted the presumption that Mr. Clement's failure to exercise due care caused Mrs. Dershowitz's death.

For the same reasons, Mr. Clement violated VTL Section 1122-a. Section 1122-a provides that the "operator of a vehicle overtaking, from behind, a bicycle proceeding on the

same side of a roadway shall pass to the left of such bicycle at a safe distance until safely clear

thereof." Video footage demonstrated that Mrs. Dershowitz was biking close to the right,

northern curb and ahead of the Postal Truck at all times. As a conscientious biker, she followed

the rules of the road and stopped at the Ninth Avenue light. She was "in control" and proceeding

at a safe speed. (Tr. 485:10-14.) Thus, if any driver wanted to overtake her, it was that driver's

duty to do so *only* if he could maintain a "safe distance" between his vehicle and her bicycle. Mr.

Clement did not maintain such a distance.

### 2.    New York City Traffic Rules and Regulations

A violation of the New York City Traffic Rules and Regulations, codified in Chapter 4 of

Title 34 of the Rules of the City of New York (the "RCNY"), constitutes "some evidence of

negligence." See Elliott v. City of New York, 95 N.Y.2d 730, 734-35 (2001). Where inconsistent

or in conflict with the VTL's right of way provisions, RCNY supersedes the VTL. See VTL

§ 1642(a)(10). Under the RCNY, "[n]o person shall operate a vehicle in a manner that will

endanger any person or property." 34 RCNY § 4-02(c). For the reasons already stated, Mr.

Clement violated this provision as well.

### 3.    Common Law

New York common law also holds that "[a] driver is negligent when an accident occurs

because he or she failed to see that which through the proper use of his or her senses he or she

should have seen." Michael Dalton, 2014 WL 7423760, at *23 (quoting Katanov v. Cnty. of

Nassau, 936 N.Y.S.2d 285, 287 (2d Dep't 2012)). The credible evidence introduced at trial all

but requires the Court to infer that Mr. Clement should have seen that which was there to be

seen: Mrs. Dershowitz, biking continuously and calmly, hugging the right hand side of the

roadway. After passing Ninth Avenue, Mrs. Dershowitz was ahead of him by at least six

seconds. Had Mr. Clement scanned the roadway through his large panoramic windshield or used his right side mirror, he would have seen her.

### B.      The Negligently Parked Postal Trailer

As set out by New York common law and New York City laws, the Postal Service had a duty to maintain its premises in a safe condition and properly park the Postal Trailer in a non-negligent manner. The Postal Service breached this duty, contributing to Mrs. Dershowitz's death.

### 1.      New York Law

Under New York law, occupiers of land, including the Postal Service, have a general duty "to maintain their properties in reasonably safe condition" in light of the circumstances. Krull v. United States, 9 F. Supp. 3d 298, 302-03 (W.D.N.Y. 2014) (citing Di Ponzio v. Riordan, 89 N.Y.2d 578, 583 (1997)); Delano v. United States, 859 F. Supp. 2d 487, 502 (W.D.N.Y. 2012) (quoting Robinson v. United States, 330 F. Supp. 2d 261, 287 (W.D.N.Y. 2004) (quoting Michalski v. Home Depot Inc., 225 F.3d 113, 117 (2d Cir. 2000))); Galindo v. Town of Clarkstown, 2 N.Y.3d 633, 636 (2004). See also Haskin v. United States, 569 F. App'x 12, 16 (2d Cir. 2014) (citing Zuckerman v. State, 618 N.Y.S.2d 917, 918 (2d Dep't 1994) ("[T]he owner or possessor of property [has] the duty to make reasonable efforts to inspect the property so as to determine the presence of dangerous conditions.")). In determining the scope of the Postal Service's duty, the New York Court of Appeals has directed courts to consider "whether the relationship of the parties is such as to give rise to a duty of care, whether the plaintiff was within the zone of foreseeable harm and whether the accident was within the reasonably foreseeable risks. The nature of the inquiry depends, of course, on the particular facts and

circumstances in which the duty question arises." Di Ponzio, 89 N.Y.2d at 583 (citations

omitted). See also Galindo, 2 N.Y.3d at 636.

Generally, a landowner has no duty "to warn against a condition that can readily be

observed by those employing the reasonable use of their senses, 'the situation being, in such a

case, a warning in itself.'" Robinson, 330 F. Supp. 2d at 288 (quoting Olsen v. State, 25 N.Y.2d

665, 667 (1969)). "Even where the condition is open and obvious," however, "a landowner's

duty to maintain property in a reasonable safe condition is not obviated." Phelan v. State of New

York, 804 N.Y.S.2d 886, at *10 (Ct. Cl. 2005). The exercise of reasonable care "may include

warning other motorists" and road users "of the hazards posed by the obstruction." Jones v. G &

I Homes, Inc., 927 N.Y.S.2d 206, 208 (3d Dep't 2011).

Here, the Court considers the Postal Trailer's size, placement blocking the sidewalk, and

the distance it protruded into the street to determine "issues of foreseeability and proximate

cause." Reuter v. Rodgers, 648 N.Y.S.2d 989, 989 (2d Dep't 1996). See Boehm v. Telfer, 672

N.Y.S.2d 959, 960 (3d Dep't 1998) (denying summary judgment where testimony raised

questions of fact as to whether the defendant "was negligent in the manner in which he parked

[his] truck *given its size, proximity to the corner, distance from the curb, the angle at which it

was parked and the width of the road*") (emphasis supplied). The Postal Trailer blocked the

entire northern sidewalk and extended six feet and three inches into the roadway, or right lane of

traffic. Its placement forced pedestrians to leave the sidewalk and enter the roadway to

circumvent it. It also forced any vehicles travelling in the right-hand lane, including bicycles, to

merge left and into traffic in order to go around it. Its placement also contributed to a narrowing

of the roadway such that the street diminished to a one-lane road. The portion of 29th Street

where the Postal Trailer was parked was also well-travelled. In addition to lay traffic, Postal

Service vehicles regularly transversed the street, as evidenced by Mr. Clement's having driven the street several times that same day to make rounds and pick up deliveries. These observations, and the dangerous condition the Postal Trailer's placement created, were reasonably foreseeable. The Postal Service violated its duty to maintain its premises in a safe condition in view of the circumstances.

Further, "owners of improperly parked cars," including the federal government as owner of the Postal Trailer, "may be held liable to plaintiffs injured by negligent drivers of other vehicles, depending on the determinations by the trier of fact of the issues of foreseeability and proximate cause unique to the particular case." Reuter, 648 N.Y.S.2d at 989 (collecting cases). See Hopkins v. Ambrose, 903 N.Y.S.2d 784, 785 (3d Dep't 2010) (reversing grant of summary judgment where "evidence presented by plaintiff created questions of fact regarding whether [the defendant] negligently parked his vehicle . . . thereby obstructing the roadway and contributing to the accident"); In re Yavkina, 874 N.Y.S.2d 235, 236 (2d Dep't 2009) ("The issue of whether the [] defendant's employee was negligent in double-parking his delivery truck and, if so, whether the negligence was a proximate cause of the accident should be submitted to the jury."); Smalls v. N.Y.C. Transit Auth., 889 N.Y.S.2d 507, *2 (Sup. Ct. 2009) (denying summary judgment where it remained a question of fact "whether the illegally parked cars, which forced the passengers to disembark in the street, were the proximate cause of the plaintiff's" injury). "The common-law rule imposing liability for improperly parked vehicles 'is not limited to statutory violations but also applies to circumstances evidencing ordinary negligence.'" Perry v. Pelersi, 689 N.Y.S.2d 772, 773 (3d Dep't 1999) (quoting Boehm, 672 N.Y.S.2d at 960). For the reasons mentioned, the Postal Service's negligently parked trailer was a proximate cause of the accident.

The Postal Trailer's placement also was not so apparent that it obviated the Postal Service's duty to warn travelers. In Buccino v. City of New York, for example, the Appellate Division, First Department, held that where the plaintiff regularly bicycled the same route to work, "a speed bump on the 20-foot-wide roadway . . . coupled with a car [legally] parked near the speed bump, which car plaintiff had seen in the same location many times before," were "plainly observable and did not pose any danger to someone making reasonable use of his or her senses." 923 N.Y.S.2d 322, 322-23 (1st Dep't 2011) (quoting Rivera v. City of New York, 870 N.Y.S.2d 241, 243 (1st Dep't 2008)). Here, unlike the plaintiff in Buccino, the Postal Trailer's presence was not previously known to Mrs. Dershowitz. There is no evidence that Mrs. Dershowitz had biked 29th Street before. Although the Postal Trailer was plainly observable, it posed a danger to Mrs. Dershowitz despite use of her senses. Further, there is no evidence that the Postal Service signs, or any other signs along West 29th Street between Ninth and Tenth Avenues, warn pedestrians, bicyclists or vehicles that the roadway has obstructions or advise them to use a different route instead. To the contrary, the right overpass sign clearly states that there is no parking at any time, which suggests that the roadway will be clear. Mr. Clement stated that other than a speed limit sign, there were no other signs prohibiting or warning pedestrians and bicyclists about proceeding down 29th Street. The Postal Service had a duty to warn travelers of the reasonably foreseeable dangerous situation.

## 2. New York City Traffic Rules and Regulations

The RCNY provides that "[n]o person shall stop, stand or park a vehicle, whether attended or unattended, other than in accordance with authorized signs, pavement markings, or other traffic control devices." 34 RCNY § 4-08(a)(1). "When official signs, markings or traffic control devices have been posted prohibiting, restricting or limiting the parking of vehicles, no

person shall park any vehicle in violation of the restrictions posted on such signs, markings or traffic control devices." 34 RCNY §§ 4-07(b), (d). The Postal Trailer was parked in direct violation of the Postal Service's own official regulations.

While the sign on the left, southern portion of the 29th Street overpass provided, "THIS SIDE OF THE STREET U.S. POSTAL TRAILER PARKING ONLY," the sign on the right, northern side provided, "THIS SIDE OF THE STREET NO PARKING AT ANY TIME. TOW AWAY ZONE." (Gov't Ex. 23.) A reasonable reader would understand the signs to indicate that on the left, southern side of the street, Postal Service trailers are allowed to parallel park and other vehicles are not; whereas on the right, northern side of the street, neither Postal Service trailers nor any other vehicles are allowed to parallel park. The Postal Service appears to use the northern side of the street and sidewalk to reach its loading bays in Morgan Mail North, however, in direct contravention of its own sign.

That the Postal Trailer was parked in violation of the Postal Service's own sign further supports the Court's finding that the Postal Trailer was parked in a negligent manner. See 34 RCNY §§ 4-07(b)(1), (d); Sullivan v. Locastro, 577 N.Y.S.2d 631, 634 (2d Dep't 1991) (finding that "various prohibitions against parking [between 7:00 A.M. and 9:00 A.M.] where the bus was parked did not impose a higher standard of care than the common law standard, but essentially merged with the common law standard – i.e., ordinary care commensurate with the existing circumstances." (internal quotations and citation omitted)). See also Sieredzinski v. McElroy, 756 N.Y.S.2d 761, 762 (2d Dep't 2003) (granting summary judgment for the defendants where "there was no evidence to support a finding of negligence on the part of the moving defendants, whose tractor trailer was legally parked at the time of the accident"). It was certainly reasonably foreseeable that a bicyclist, or pedestrian, would use the right lane on 29th Street at the same

time that that the Postal Trailer was parked, and the roadway subsequently narrowed, while steady vehicular traffic proceeded down the street. But for the Postal Trailer's placement, Mrs. Dershowitz would have not have had to travel into the center lane of traffic, which afforded a negligent driver, Mr. Clement, the opportunity to hit her. Absent its placement, the traffic would not have been forced to merge into one, narrowed center lane, and Mrs. Dershowitz might have had space to maneuver and avoid any accident. The negligently parked Postal Trailer, along with Mr. Clement's negligent driving, were the proximate causes of the accident.

### C.      Contributory Negligence

Under New York's pure comparative negligence scheme, there can be more than one proximate cause of an accident. See Saint v. United States, 483 F. Supp. 2d 267, 279-83 (E.D.N.Y. 2007); Caraballo, 830 F.2d at 22. A plaintiff's culpable conduct will not bar recovery but only diminishes it proportionally. N.Y. CPLR 1411. See Goodlett v. Kalishek, 223 F.3d 32, 35-36 (2d Cir. 2000). The defendant bears the burden of proving contributory negligence on the part of the plaintiff by a preponderance of the evidence. Kane, 189 F. Supp. 2d at 52 (citing 1B NYPJI 2:275.1 (2000)). See, e.g., Galvin v. Zacholl, 755 N.Y.S.2d 175, 177 (4th Dep't 2003) (finding no liability where, in dry, sunny and clear weather, the straightaway vehicle was traveling four miles per hour over the speed limit, and there was no evidence that the driver could have avoided the collision had she traveled at the speed limit). The government has failed to meet its burden that Mrs. Dershowitz was contributorily negligent.

VTL § 1231 provides that, "[e]very person riding a bicycle . . . upon a roadway shall be granted all of the rights and shall be subject to all of the duties applicable to the driver of a vehicle by this title . . . ." Consequently, "[a] bicyclist is required to use reasonable care for his or her own safety, to keep a reasonably vigilant lookout for vehicles, and to avoid placing himself

or herself in a dangerous position." Palma v. Sherman, 867 N.Y.S.2d 111, 113 (2d Dep't 2008) (citing VTL § 1146). See also Kane, 189 F. Supp. 2d at 52 ("A plaintiff must exercise the reasonable care that a reasonably prudent person would use under similar circumstances to protect herself from injury.") (citation omitted). VTL § 1234(a) also provides that bicyclists shall bike in a designated lane, or, if a bicycle lane "has not been provided, *near the right-hand curb or edge of the roadway* . . . in such a manner as to prevent undue interference with the flow of traffic *except . . . when reasonably necessary to avoid conditions that would make it unsafe to continue along near the right-hand curb or edge*." VTL § 1234(a) (emphasis supplied).

Here, in all respects, the evidence produced supports the conclusion that Mrs. Dershowitz was an experienced biker who did just what the VTL instructed: she wore a helmet, rode near to the curb, travelled at a reasonable speed, stopped at the Ninth Avenue traffic light, and appeared to be a vigilant, cautious, and rule-abiding rider. See also VTL § 1234(b) (requiring bicyclists to ride "single file when being overtaken by a vehicle"); VTL § 1236(d) (requiring that bicycles be equipped with reflectors). When Mrs. Dershowitz did leave the curb, she did so only "to avoid conditions that would make it unsafe to continue": namely, the protruding and perpendicular parked Postal Trailer. VTL § 1234(a).

The Court credits Ms. Sunshine's testimony that she saw Mrs. Dershowitz "losing her balance" and continue to ride even though "she still wasn't balanced." (Tr. 599:17-600:4.) This observation could support the government's argument that Mrs. Dershowitz negligently chose to enter a dangerous situation when she herself was unsteady. But the Court finds it more probable that Ms. Sunshine observed Mrs. Dershowitz wobbling before impact. All the evidence suggests that Mrs. Dershowitz was a careful, competent and rule-abiding biker. To the extent she wobbled before she was fatally struck, she may well have lost her balance as she sensed the Postal Truck's

close proximity. Alternatively, Ms. Sunshine may reasonably recollect the moment of impact

played out more slowly than Mr. Genna believed it would have – a common experience when

people witness tragic events. Whatever happened, the government has not offered proof beyond

a preponderance of the evidence that Mrs. Dershowitz's own negligence was at fault. The

government declined to call its own reconstructionist expert who presumably would have offered

an alternative narrative contradicting Mr. Genna's hypothesis and explaining why Mrs.

Dershowitz herself was negligent. Because the government did not, the only reliable evidence

that supports its contention is Mrs. Sunshine's testimony. That is not enough to meet its burden.

## IV.   Damages

Having determined that the government is 100% liable for Mrs. Dershowitz's death, the

Court turns to damages. The plaintiff has proven by a preponderance of the evidence that Mrs.

Dershowitz would have worked and would have started her own mediation business. Indeed, the

testimony was overwhelming that Mrs. Dershowitz was not at the end of her career but at the

beginning of a new professional stage. Having reinvented herself several times, including going

to law school when her first child was already in college, it is plain that Mrs. Dershowitz was not

someone who let age limit her.

Thus, it has established lost economic earnings beyond the realm of pure speculation.

Because the assumption that Mrs. Dershowitz would make $450 or $600 per hour is not fairly

inferable from the evidence, however, the Court does not adopt either expert's complete financial

estimates.

Under the FTCA, damages are determined using the law of "the place where the

[tortious] act or omission occurred." 28 U.S.C. § 1346(b)(1). In New York, damages in wrongful

death actions are awarded pursuant to the New York Estates, Powers and Trusts Law. Section 5-

4.3 provides that the Court shall award damages in the amount it "deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." N.Y. EPTL § 5-4.3. See Hyung Kee Lee v. New York Hosp. Queens, 987 N.Y.S.2d 436, at *3 (2d Dep't 2014).

New York "steadfastly restrict[s]" recovery to pecuniary losses. See Ferrarelli v. United States, 90 Civ. 4478 (JMA), 1992 WL 893461, at *7 (E.D.N.Y. Sept. 24, 1992) (citing Gonzalez v. N.Y.C. Housing Auth., 77 N.Y.2d 663, 667 (1991) ("Gonzalez I")). Pecuniary losses include loss of past and future earnings, household services, parental guidance, funeral expenses incurred as the result of the decedent's death, and conscious pain and suffering. See Ferrarelli, 1992 WL 893461, at *7. "Pecuniary" is "used in distinction to those injuries to the affections and sentiments which arise from the death of relatives, and which, though most painful and grievous to be borne, cannot be measured or recompensed by money." Gonzalez I, 77 N.Y.2d at 668 (quoting Tilley v. Hudson Riv. R.R. Co., 24 N.Y. 471, 476 (1862)). Therefore, pecuniary loss excludes "grief, lost society, lost companionship, [and] lost affections." Ferrarelli, 1992 WL 893461, at *7.

The award for future losses is fact-specific, problematic, and necessarily "indefinite, prospective, and contingent." McKee v. Colt Elec. Co., 849 F.2d 46, 52 (2d Cir. 1988) (quoting Houghkirk v. Delaware Hudson Canal Co., 92 N.Y. 219, 225 (1883); Ferrarelli, 1992 WL 893461, at *13. See also Riley v. Capital Airlines, 247 N.Y.S.2d 427, 445 (Sup. Ct. 1963) ("[T]here is no mathematical formula for computing damages" in a wrongful death case.)). To calculate the proper compensation, New York courts have enumerated several factors to consider, including "the decedent's age; his health; his expectations; his earning ability; his income; the possibility of additional income; and the number, age, and situation of those

dependent upon the decedent for support, and the manner in which he would have supported them." Morgan Guar. Trust Co. v. Texasgulf Aviation, Inc., 604 F. Supp. 699, 700 (S.D.N.Y. 1985). See also Mono v. Peter Pan Bus Lines, Inc., 13 F. Supp. 2d 471, 478 (S.D.N.Y. 1998) (citing Greenspan v. East Nassau Med. Group, 611 N.Y.S.2d 580, 581 (2d Dep't 1994)). When determining appropriate damages, the Court is "bound by a standard of reasonableness." Mastrantuono v. United States, 163 F. Supp. 2d 244, 258 (S.D.N.Y. 2001). Ultimately, "the calculation rests within the province of the fact-finder." Ferrarelli, 1992 WL 893461, at *7 (citation omitted).

### A.      Past and Future Lost Earnings

Like damages more broadly, determining lost earnings "is necessarily speculative and fraught with difficulties." Kavanaugh v. Nussbaum, 129 A.D.2d 559, 563 (2d Dep't 1987) (citation omitted). See also Sinkov v. Americor, Inc., 419 F. App'x 86, 90 (2d Cir. 2011) ("Estimates of a deceased person's future earning capacity are inherently speculative to some degree."). As a result, trial courts have "great latitude in deciding whether to admit or exclude expert testimony." Id. at 90 (citing United States v. Onumonu, 967 F.2d 782, 786 (2d Cir. 1992)). "[A]n expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).[5] If the testimony is admitted, the Court has discretion to determine "whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." Sinkov, 419 F. App'x at 90 (citing Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984) (citing Fed. R. Evid. 703)). The Court may

---

[5] On October 21, 2014, the government moved *in limine* to exclude evidence of future lost earnings, which the plaintiff opposed on October 28, 2014. (ECF Nos. 38-42.) At the November 26, 2014, final pretrial conference, the Court denied the government's motion, finding that the government's argument went to the weight of the evidence and not the admissibility. (ECF No. 50.)

reduce damages, or not award them at all, "when they are based on contingencies which are 'uncertain, dependent on future changeable events and, thus, inherently speculative.'" Phelan, 804 N.Y.S.2d at *13 (quoting Mono, 13 F. Supp. 2d at 478 (quoting Farrar v. Brooklyn Union Gas Co., 73 N.Y.2d 802 (1988))). See, e.g., Carroll v. United States, 295 F. App'x 382, 385 (2d Cir. 2008) (holding that where the decedent never worked as a physician's assistant and never took the licensing exam necessary to practice medicine and did not show that he accepted or worked in such a position in the past, earnings as a physician's assistant were wholly speculative); Tassone v. Mid-Valley Oil Co., 5 A.D.3d 931, 932-33 (3d Dep't 2004) (holding that where an expert relied on the injured plaintiff's age and income level at the time of the accident, his work-life expectancy for an individual in plaintiff's profession, his work experience and track record as a hard worker, and a letter from the plaintiff's employer about his prospects, "the jury's award of $4,264,578 for future loss of income" did not "deviate[] materially from what would be reasonable compensation"); Kirschhoffer v. Van Dyke, 173 A.D.2d 7, 10 (3d Dep't 1991) (upholding an award for lost future earnings based upon the earning capacity of a teacher where the plaintiff demonstrated that there were jobs available in her local school district that required no further training or education).

The starting point to determine the value of past and future lost earnings is a "decedent's gross income at the time of death." Imbierowicz v. A.O. Fox Memorial Hosp., 841 N.Y.S.2d 168, at *4 (3d Dep't 2007). See also Phelan, 804 N.Y.S.2d at *13. The factfinder may also consider expected changes in the decedent's future earnings where it is sufficiently probable that such changes were forthcoming. Id. at *13; Kirschhoffer, 173 A.D.2d at 10 ("Recovery for lost earning capacity is not limited to a plaintiff's actual earnings before the accident . . . and the assessment of damages may instead be based upon future probabilities."). See also Boucher, 73

F.3d at 21; <u>Mono</u>, 13 F. Supp. 2d 471; <u>Imbierowicz</u>, 841 N.Y.S.2d at 173 (citing <u>Farrar</u>, 73 N.Y.2d at 804).

The Court finds that Mrs. Dershowitz had not left the New York State Supreme Court with the intent to stop working completely. Although Mrs. Dershowitz's only income at the time of her death was her social security and pension benefits, the evidence at trial overwhelmingly demonstrated her intent to continue working. Mr. Dershowitz, Adam, Rana, and Mrs. Cohen all testified credibly that she planned to move on to the next phase of her career as a private mediator. Relying on the testimony of Mrs. Dershowitz's noteworthy work ethic, that she already changed her career once (at age 42) to become a lawyer, and that she had always worked, the Court is confident that Mrs. Dershowitz intended to keep working. The government presented no evidence, and elicited no testimony on cross-examination, that challenged this conclusion.

The next inquiry is more complicated: the probability, likely success, and form that Mrs. Dershowitz's future work as a private mediator would take. Mr. Dershowitz testified that Mrs. Dershowitz's private mediator friends were paid $450 an hour, while "[s]ome of the judges were making $600, $650 an hour." (Tr. 157:7-8.) Mrs. Cohen testified that based on Mrs. Dershowitz's intelligence, training, education, life experiences, and reputation she would make "[n]o less than $600 an hour." (Tr. 242:20.) She testified about former judges who practiced through JAMS and charged that rate or higher.

Specifically, Mrs. Cohen referred to three mediators to predict Mrs. Dershowitz's hourly rate: Betty Ellerin, Saralee Evans, and Milton Mollen – all of whom had been judges in the past and had been practicing as private mediators for some time. Although Mrs. Dershowitz's may have functioned as a "partner" to Justice Friedman, she was never a judge. All three judges also

functioned out of firms or intermediaries, such as JAMS, where the hourly rate might have been higher given those institutions' reputations as well as necessary overhead costs.

Unfortunately, no evidence was produced regarding the rates of private solo mediators – especially ones who are not former judges – other than Mr. Dershowitz's belief that mediators were being paid around $450. The Court would have valued evidence concerning the economics of a solo mediator's practice. Relatedly, there was no evidence as to how much former judges Ellerin, Evans, or Mollen made when they began their practices as compared to what they make now, or how much of their rate goes to their institution. The economic experts' rates are based on a profile that is not Mrs. Dershowitz.

Consequently, the Court finds the testimony that Mrs. Dershowitz would have earned $450 or $600 per hour for a set number of hours far too speculative to support a basis for Mrs. Dershowitz's lost earnings. See, e.g., Boucher, 73 F.3d at 20-22 (finding that an expert's testimony as to lost earnings, where the plaintiff worked sporadically in the eleven years before the accident but the expert calculated the lost earnings assuming the plaintiff would have worked full-time until retirement, were based on "a complete break with [the plaintiff's] work history," were not of "probative value," and were speculative); Wanamaker v. Pietraszek, 486 N.Y.S.2d 523, 524 (4th Dep't 1985) (holding that where the plaintiff introduced the testimony of an employee receiving training in a field decedent was scholastically ineligible for, that witness's salary level was non-probative of the decedent's future salary level and lost earnings). Convinced that Mrs. Dershowitz would have been prone to work long hours if she was in town but would have taken chunks of time off to visit her grandchildren, the Court finds that the parties' evidence regarding the average number of hours Mrs. Dershowitz would have worked per week is also too speculative.

The only non-speculative evidence of Mrs. Dershowitz's future earnings is the historical data of what her salary had been and what salary had been affirmatively offered to her: (1) her $127,438.96 salary before she retired as a Special Referee, and (2) Mrs. Dershowitz job offer, as a full-time contract partner, making $225,000 per year. There is undoubtedly a difference between the public sector salary Mrs. Dershowitz had been making as a Special Referee and the salary that mediators make in private practice: Mrs. Dershowitz took the buyout, in part, to make more money than she had been making while working more flexible hours. As a result, Mrs. Dershowitz's past salary is an inappropriate measure of her lost earnings. Turning to Mrs. Cohen's job offer, there is no evidence that Mrs. Dershowitz turned it down because it was less than she believed she could earn as a private mediator. Rather, the only evidence presented shows that Mrs. Dershowitz turned it down because she did not want to litigate and wanted greater flexibility with her time. Thus, Mrs. Cohen's salary offer is uncontroverted evidence of the salary Mrs. Dershowitz could have earned, based on the testimony of a woman who knew and highly valued Mrs. Dershowitz's skills.

The court's analysis in Mono v. Peter Pan Bus Lines, Inc. is helpful. 13 F. Supp. 2d 471. In that case, the decedent had been a full-time bookkeeper from 1986 through 1994. Id. at 478. During that time, she attended college and, at age 52, received a bachelor's degree in accounting with the goal of enhancing her earning capacity. Id. at 478-79. In 1994, after her employer went out of business, she decided to freelance as a bookkeeper. Id. at 479. A friend of the decedent, and a judge, testified that the decedent had decided that if, after two years, she could not earn as much money as she had with her former employer, she would seek a full-time bookkeeper job instead. Id. An economic expert then testified about the decedent's future earnings had she worked as a freelance bookkeeper until age of 65 ($28,245) or 70 ($51,993) versus as a fulltime

bookkeeper until age 65 ($156,000) or 70 ($313,000). Id. The defendants argued that her earnings as a fulltime bookkeeper were speculative because Mono had not worked fulltime during the two years preceding her death. The court concluded that the expert "did not speculate on whether her freelance business might flourish, nor were his projections derived from the earnings of dissimilar individuals. Rather, [his] calculations were *grounded in historical data* of [the decedent's] earnings." Id. at 479-80 (emphasis supplied). The court relied on the fact that the plaintiff's past earnings as a fulltime bookkeeper were a known entity: Mono had in fact earned that salary and would go back to earning that salary if she could not succeed making more in her (speculative) freelance business.

Here, like Mono, the hourly rate that Mrs. Dershowitz would have made and how many hours she would have billed and collected in private practice is too speculative. See also Agron v. Trustees of Columbia Univ., 88 Civ. 6294 (MJL), 1998 WL 427620, at *4 (S.D.N.Y. July 29, 1998) (finding an expert's assumption, based on "the average salary of a 'typical female college graduate' in 1986 . . . wholly unsupported" and speculative). Like Mono's fulltime bookkeeping salary, however, the Court knows how much, at the very least, Mrs. Dershowitz could have earned in the private sector. The salary Mrs. Cohen offered Mrs. Dershowitz is evidence of the market rate Mrs. Cohen assigned to this highly skilled lawyer. Consequently, the Court finds that annual earnings of $225,000 are sufficiently probable and the appropriate measure.

The Court recognizes that Mrs. Cohen offered to pay Mrs. Dershowitz $225,000 for full-time litigation work, and that Mrs. Dershowitz declined the offer because she wanted neither to work fulltime nor to litigate. Even so, it does reflect the value of her services as supported by the evidence at trial. Moreover, although the Court declines to award a salary based on a lodestar calculation, in light of the testimony, it is reasonable to find that Mrs. Dershowitz – as a solo

mediator with a stellar reputation in the field but no private sector experience – could demand $300 per hour. Thus, if she billed *and collected* 15 hours each week, her gross income would amount to $225,000 (assuming a 50-week year, or 750 hours). This cross-check further satisfies the Court of the reasonableness of an annual earnings of $225,000.

Next, the Court must determine the appropriate growth rate and work-life expectancy for Mrs. Dershowitz. First, the Court adopts Dr. Freifelder's 3.47% growth rate. That rate was based in the Consumer Price Index and took into account the fluctuations in the legal services sector between 2003 and 2013. Although Dr. Crakes used a 2% growth rate, he testified that he chose 2% because it seemed "reasonable" and was lower than the typical growth rate. (Tr. 420:2-4.).

Second, the Court adopts Dr. Freifelder's analysis that Mrs. Dershowitz would have worked until her healthy-life expectancy, although the Court adopts the statistically exact number of 80.89, rather than rounding down to age 80. Given Mrs. Dershowitz's health at the time of her death, her healthy lifestyle, and her family genetics, the Court finds that Mrs. Dershowitz would have been healthy enough to do basic activities of normal living until age 80.89. Given her work ethic, the Court also finds that Mrs. Dershowitz would have worked as long as she was able.

### B.    Business Expenses

Business expenses are an appropriate deduction from a decedent's gross earnings. See, e.g., Molter v. Gaffney, 710 N.Y.S.2d 654, 656 (3d Dep't 2000); Bielich v. Winters, 464 N.Y.S.2d 189, 190 (1st Dep't 1983). For business expenses, Dr. Crakes assumed Mrs. Dershowitz would pay 10% of her earnings, whereas Dr. Freifelder deducted a flat rate of $60,000. Here, the Court finds that business expenses would include rent for space to hold mediations, advertising, CLE programs, phone and administrative needs, and legal research.

Although there was no evidence about any of these costs, the Court does not believe that a solo

mediator working primarily from home would reasonably spend $60,000 to run her business.

Moreover, whatever these expenses are, they would not fluctuate significantly based on Mrs.

Dershowitz's income and work level. Thus, the Court adopts a flat rate. Because 10% of

$225,000 is a reasonable measure, the Court finds that the business expenses should be

calculated at a flat rate of $22,500 per year.

### C.    Personal Consumption

A decedent's personal consumption also is an appropriate deduction from projected

earnings. See, e.g., Ferrarelli, 1992 WL 893461, at *11. Both Drs. Crakes and Freifelder

assumed Mrs. Dershowitz's personal consumption rate would be 20% of her total earnings,

pension benefits, and social security benefits. As a result, the Court adopts this rate.

### D.    Payments from Collateral Sources

Courts also award plaintiffs the fringe benefits, including social security and pension

benefits, that a decedent's family would have received but for the decedent's death. See, e.g.,

Saint, 483 F. Supp. 2d at 288; Ferrarelli, 1992 WL 893461, at *2; Caban v. City of New York,

848 N.Y.S.2d 40, 42 (1st Dep't 2007). Mrs. Dershowitz received a monthly social security

benefit of $1,822.00 beginning in March 2011. (Pl's Ex. 18.) She also received pension benefits

that stopped at the time of her death in the amount of $7,558.30 per month, or $90,699.60 per

year. The Court finds Dr. Crakes's measurements – calculating these benefits to the end of Mrs.

Dershowitz's life expectancy – the appropriate measure. The Court found Dr. Freifelder's careful

consideration of the effect on expenses when a two-person household becomes a one-person

household helpful. Although Mrs. Dershowitz's personal consumption costs would rise at Mr.

Dershowitz's death, there was no evidence to support Dr. Freifelder's assumption that they

would rise so substantially as to, in effect, result in Mrs. Dershowitz consuming 100% of her

pension and social security benefits. There was no evidence at trial concerning, for example,

whether the Dershowitzes owned their apartment out right, had a mortgage, or rented; or whether

there were already funds saved to cover such household expenses. Without any evidence, Dr.

Freifelder's conclusion is too speculative.

The Court adopts Dr. Freifelder's 2.49% growth rate for social security retirement

benefits because it was grounded in the average increase of the social security cost of living

index between 2004 through 2014, and adopts Dr. Freifelder's COLA increase for Mrs.

Dershowitz New York pension as also similarly grounded in fact.

### E.    Household Services

Mrs. Dershowitz's estate is entitled to recover for the past and future loss of personal

services that Mrs. Dershowitz would have provided Mr. Dershowitz, measured by the cost of

replacing those services. See Ferrarelli, 1992 WL 893461, at *7 (citing Gonzalez, 77 N.Y.2d at

668); Hyung Kee Lee, 987 N.Y.S.2d 436. Based on Dr. Freifelder's analysis, the Court finds that

Mrs. Dershowitz would have spent 25 hours per week on household services, based on the Dollar

Value A Day Study, calculated from the date of her death to her healthy-life expectancy. The

Court also adopts Dr. Freifelder's well-reasoned 2.15% growth rate, and values Mrs.

Dershowitz's past household services at $51,067 and future household services at $146,934.

### F.    Lost Nurture, Care, and Guidance

Recovery for wrongful death in New York includes compensation for loss of guidance

that a decedent would have provided her children. See, e.g., Shu-Tao Lin v. McDonnell Douglas

Corp., 742 F.2d 45, 52 (2d Cir. 1984); Ferrarelli, 1992 WL 893461, at *13-14. While children

"may not recover for loss of a parent's companionship, they may recover for the pecuniary loss

suffered as a result of the lost nurture, care, and guidance they would have received if the parent had lived." McKee, 849 F.2d at 50. The nebulous concept of pecuniary loss has been characterized as the premature "loss of training and education that the deceased parent might have given . . . [that] would have enhance[d] the child's future pecuniary interests and worldly prospects." Ferrarelli, 1992 WL 893461, at *14 (quoting 37 New York Jurisprudence 2d, Death § 321 (1984)). See also Mono, 13 F. Supp. 2d at 477 (quoting Gonzalez v. N.Y.C. Hous. Auth., 555 N.Y.S.2d 107, 108-09 (1st Dep't 1990) ("Gonzalez II")); Plotkin v. N.Y.C. Health & Hosp. Corp., 633 N.Y.S.2d 585, 586 (2d Dep't 1995).

Out of recognition for "the realities of an increasingly complex society where children rely more heavily, and for a greater number of years, on the guidance of their parents," there is no prohibition barring recovery by an adult child. McKee, 849 F.2d at 52; Gonzalez, 77 N.Y.2d at 668-69 (explaining that financially independent adult grandchildren constitute "distributees" entitled to recover under the EPTL). The key requirement for recovery is proof of *pecuniary* loss. "[F]ixing the proper amount for this award" is inherently "problematic," "sometimes arbitrary and often speculative." Ferrarelli, 1992 WL 893461, at *13 (citing Shu-Tao Lin, 742 F.2d at 52). "[B]ecause direct evidence of pecuniary injury is often unavailable," a court should consider, in part, "the degree of dependency of the distributees upon the decedent and the probable benefits they would have received but for the untimely death." McKee, 849 F.2d at 52.

While the damages award must fit the plaintiff's particular circumstances, the Court looks to verdicts in other cases to provide guidance. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 425 (1996) ("To determine whether an award deviates materially from what would be reasonable compensation, New York State courts look to awards approved in similar cases." (internal quotations and citation omitted)). Awards in loss of guidance cases generally range

from $0 to $75,000 per child, with the larger sums being granted to younger children as well as adult children who lived with or received financial and household assistance from the deceased parent. Compare McKee, 849 F.2d 46 (awarding a total sum of $294,000 to decedent's four children who were aged 14-22 at the time of their father's death – or $73,500 per child); Ferrarelli, 1992 WL 893461, at *14 (awarding three minor children a total award of $225,000 – or $75,000 per child) with Mono, 13 F. Supp. 2d at 477-78 (reducing $240,000 jury award to $75,000 to decedent's 29 year-old son where son had been living across the country for the past six years, worked fulltime for NBC News, talked to his mother two to five times a week, and suffered from compulsive personality disorder and a learning disability with which his mother assisted him; the 27 year-old son who lived with his parents at the time of his mother's death recovered no damages); Perez v. St. Vincents Hosp. & Med. Ctr. of N.Y., 886 N.Y.S.2d 486 (2d Dep't 2009) (vacating two $200,000 awards to decedent's adult son and daughter where "there was no evidence as to any pecuniary injury"); Rubin v. Aaron, 594 N.Y.S.2d 797, 799 (2d Dep't 1993) (limiting adult child's loss of parental guidance to $25,000); Wood v. State, 492 N.Y.S.2d 481, 484 (3d Dep't 1985) (awarding adult children $25,000 each because decedents "were loving parents who helped their children in every way possible," even though there was no proof of the parents' financial assistance). But see McHugh v. N.Y.C. Transit Auth., 943 N.Y.S.2d 891 (1st Dep't 2012) (awarding decedent's two adult sons $497,664 where decedent mother had resided with one son, providing him financial assistance and household help, and maintained regular contact with her other son, whom she visited frequently, provided career and life advice, and assisted financially with student loans).

Here, neither child lived with Mrs. Dershowitz. At the time of her death, Adam and his family lived in California, and Rana and her family lived in Colorado. As a result, Mrs.

Dershowitz did not provide meals or childcare for their families on a regular basis. Adam and Rana are also exceptionally accomplished: they received doctoral degrees respectively from M.I.T. and Harvard Law School, and are highly established in their respective fields of engineering and sports law. Their personal and professional accomplishments are a testament to their parents, and it is clear that their pecuniary interests and worldly prospects have been greatly enhanced by the training, education, and guidance that they already received from their mother. Ferrarelli, 1992 WL 893461, at *14. These personal and professional successes lie in stark contrast to the prospects of younger children, in the peak of their self-actualization and development, who are more likely to be stunted by the premature loss of a parent.

Still, Adam and Rana relied on their mother in other ways. Adam relied on her for his personal development, for professional advice, and on how to be a father. Rana testified eloquently about needing her mother now more than ever as she has become both a mother and a working-mother. Thus, in at least two areas where their mother had personal experience – later-staged career decisions and raising a family while maintaining an active professional life – her children now yearn for guidance. This type of parental support is different than what parents provide for their young children; but no less important.

The plaintiff argued that Rana and Adam, as distributees of Mrs. Dershowitz's estate, were entitled to $1,050,000 each for the past loss of guidance up to the date of the Court's decision and for future loss of guidance for thirty years thereafter. This extraordinary amount is in gross deviation from awards in other cases, which generally range from $0 to $75,000 – amounts that underscore the requirement that loss be pecuniary. Although the Court finds Adam and Rana's testimony credible and sincere, it cannot award money for their emotional devastation in losing a parent. It is clear from their professional and personal success that Adam

and Rana have benefitted tremendously from their mother's training and guidance. The Court

awards $25,000 each to Rana and Adam Dershowitz.

### G.    Funeral Expenses

Under New York law, a wrongful death plaintiff is entitled to recover "the reasonable

funeral expenses of the decedent paid by the distributees." N.Y. EPTL § 5-4.3. Plaintiff incurred

$13,632.15 in funeral and burial expenses. The final award in this case will include that

reasonable amount.

### H.    Conscious Pain and Suffering

Finally, damages for "conscious pain and suffering" refer to a decedent's injuries before

death and must be brought on behalf of the decedent's estate. See Heslin, 14 N.Y.3d at 77. "A

cause of action for conscious pain and suffering is separate and distinct from one for wrongful

death." Lancaster v. 46 NYL Partners, 651 N.Y.S.2d 440, 444 (1st Dep't 1996). To establish this

claim, a plaintiff must prove that the plaintiff was conscious for some period of time following

the accident. See Cummins v. Cnty. of Onondaga, 84 N.Y.2d 322, 324-25 (1994). "When the

interval between injury and death is relatively short, the degree of consciousness, severity of

pain, apprehension of impending death, along with duration are all elements to be considered."

Phelan, 804 N.Y.S.2d at 901 (internal quotations and citation omitted).

The Court again reviews pain and suffering awards in other cases. See Saint, 483 F.

Supp. 2d at 292-93. See also Sinkov, 419 F. App'x at 92-93 (upholding a $300,000 jury award

where the jury relied on common sense and common experience to conclude that an inmate

"struggled and suffered in the period between when he placed his homemade noose around his

neck and when he lost consciousness"); Gonzalez, 77 N.Y.2d at 670 (upholding a $350,000

award for conscious pain and suffering even though the medical examiner noted that two causes

of her death – a contusion of the scalp and fracture of the cervical spine – were consistent with a

simultaneous loss of consciousness and death, because there was sufficient circumstantial

evidence to support the conclusion that decedent was conscious when most of the injuries were

inflicted); Filipinas v. Action Auto Leasing, 851 N.Y.S.2d 550, 550 (1st Dep't 2008) (upholding

$750,000 award where decedent was struck in head by a minivan's side mirror, sustained serious

head injuries, but "was heavily medicated and/or sedated" within an hour of the accident); Rodd

v. Luxfer USA Ltd., 709 N.Y.S.2d 93, 94 (2d Dep't 2000) (upholding $300,000 award where

decedent "suffered severe and massive injuries" from an explosion but "any period of

consciousness was limited in duration"); Phelan, 804 N.Y.S.2d at 900-01 (denying conscious

pain and suffering awards where the decedent died within five minutes of her bicycle accident

and other than "gurgling on her own blood," there was no evidence that decedent had some level

of awareness during those minutes).

      Mr. Dershowitz and Ms. Costa both testified regarding Mrs. Dershowitz's condition after

the accident. Following the impact, at 11:59:52 a.m., Ms. Costa testified that Mrs. Dershowitz

had a pulse. At some point in the five and half minutes before the paramedics arrived at 12:06:22

a.m., however, her pulse stopped. Ms. Costa testified that she could no longer detect a pulse one

to three minutes before the paramedics arrived. During those minutes, Mrs. Dershowitz was

gasping for air, and in doing so, blood came out of her mouth, ears, and nose. She did not speak.

Other than blinking her eyelids, Ms. Costa testified that Mrs. Dershowitz never moved. Mr.

Dershowitz testified that he squeezed her hand, and she squeezed his hand back. For these

reasons, the plaintiff is due damages for the conscious pain and suffering Mrs. Dershowitz

experienced during the final two and a half to five and a half minutes of her life.

The plaintiff argued that Mrs. Dershowitz's estate was entitled to $500,000 for her conscious pain and suffering. Commensurate with awards in other similar cases, but mindful of the specific facts surrounding Mrs. Dershowitz's last minutes, the Court awards $300,000.

## I.     Calculating and Discounting the Award

Any wrongful death award must be reduced to its present value. See, e.g., Saint, 483 F. Supp. 2d at 294-95 (citing McCrann v. U.S. Lines Inc., 803 F.2d 771, 773 (2d Cir. 1986)); Ferrarelli, 1992 WL 893461, at *16-17. Accordingly, any judgment must be discounted to present value.

## CONCLUSION

For the aforementioned reasons, the Court finds the government 100% liable.

The Court finds that Mrs. Dershowitz would have made $225,000 per year, at a 3.47% growth rate, starting on January 1, 2012 and working until her healthy-life expectancy, or age 80.89; her business expenses would have totaled a flat rate of $22,500 per year; her social security and pension benefits would have run from her death to her life expectancy, with social security increasing at a 2.49% growth rate and her pension benefits increasing annually by $214.85 starting five years from her date of retirement; her personal consumption rate would have been 20% of her total earnings, pension benefits, and social security benefits, continuing through her life expectancy; and the value of her household services should be calculated at 25 hours per week based on the Dollar Value A Day Study, from the date of her death to her healthy-life expectancy. The Court awards the cost of Mrs. Dershowitz's funeral and burial expenses, awards her children $25,000 each for lost guidance and support, and $300,000 for Mrs. Dershowitz's conscious pain and suffering.

The parties are directed to compute the final award, broken down into past and future amounts (discounted to present value), and submit their final calculations to the Court within 14 days of this opinion.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
       April 8, 2015

**APPENDIX A**



**APPENDIX B**

